# No. 23-726

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

━━━◆━━━

ADAM HART,

*Plaintiff-Appellant,*

UNITED STATES OF AMERICA, ex rel., STATE OF CALIFORNIA, ex rel., STATE OF COLORADO, ex rel., STATE OF CONNECTICUT, EX REL., STATE OF DELAWARE, ex rel., STATE OF FLORIDA, ex rel., STATE OF GEORGIA, ex rel., STATE OF HAWAII, ex rel., STATE OF ILLINOIS, ex rel., STATE OF INDIANA, ex rel., STATE OF IOWA, ex rel., STATE OF LOUISIANA, ex rel., STATE OF MASSACHUSETTS, ex rel., STATE OF MICHIGAN, ex rel., STATE OF MINNESOTA, STATE OF MONTANA, STATE OF NEVADA, STATE OF NEW HAMPSHIRE, ex rel., STATE OF NEW JERSEY, ex rel., STATE OF NEW MEXICO, ex rel., STATE OF NORTH CAROLINA, ex rel., STATE OF OKLAHOMA, ex rel., STATE OF RHODE ISLAND, ex rel., STATE OF TENNESSEE, ex rel., STATE OF TEXAS, STATE OF VIRGINIA, ex rel., STATE OF WASHINGTON, ex rel., DISTRICT OF COLUMBIA, ex rel.,

*Plaintiffs,*
*(caption continued on inside cover)*

—————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK,
NO. 15-CV-903, HON. RONNIE ABRAMS

━━━━━━━━━━━━━━━━━━━━━━━━━━

**BRIEF OF DEFENDANTS-APPELLEES**

━━━━━━━━━━━━━━━━━━━━━━━━━━

Krysten L. Rosen Moller
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-5899
*Counsel for Defendants-Appellees*

August 1, 2023
*(Additional counsel on inside cover)*

*(caption, continued)*

*v.*

MCKESSON CORPORATION, MCKESSON SPECIALTY DISTRIBUTION LLC, MCKESSON SPECIALTY CARE DISTRIBUTION CORPORATION,

*Defendants-Appellees.*

———————————

S. Conrad Scott
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, NY 10018
(212) 841-1249

Ethan M. Posner
Nicholas Pastan
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-5317

*Counsel for Defendants-Appellees*

# CORPORATE DISCLOSURE STATEMENTS

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendants-Appellees state as follows:  Defendant-Appellee McKesson Corporation is a publicly held corporation that has no parent corporation, and no publicly held corporation owns 10% or more of its stock.  Defendant-Appellee McKesson Specialty Care Distribution Corporation was converted to a limited liability company, McKesson Specialty Care Distribution LLC, on or about November 1, 2018.  McKesson Specialty Care Distribution LLC is a wholly owned subsidiary of US Oncology, Inc., which is a wholly owned subsidiary of US Oncology Holdings, Inc., which is a wholly owned subsidiary of McKesson Corporation.  Defendant-Appellee McKesson Specialty Distribution LLC is a wholly owned subsidiary of McKesson Corporation.

## TABLE OF CONTENTS

INTRODUCTION ................................................................1

ISSUES PRESENTED.........................................................4

STATEMENT OF THE CASE...............................................5

    A.    Legal Background ................................................5

        1.    The Anti-Kickback Statute ................................5

        2.    The False Claims Act .......................................9

    B.    Factual Background..............................................9

    C.    Procedural History..............................................12

        1.    The government declined to intervene in Hart's 2015 *qui tam* action...................................................12

        2.    The District Court dismissed Hart's first amended complaint for failure to plead scienter. ....................................13

        3.    The District Court dismissed the second amended complaint, again for failure to plead scienter. ...........................14

STANDARD OF REVIEW .................................................19

SUMMARY OF ARGUMENT ............................................21

ARGUMENT .................................................................24

I.    A Defendant Does Not Violate the Anti-Kickback Statute Unless He Knows His Conduct Is Unlawful...................................................24

    A.    The AKS Imposes Liability Only in Cases in Which the Defendant Knows His Conduct Is Unlawful.....................................24

        1.    At minimum, "willfully" requires knowledge that one's conduct is unlawful. ...............................................24

        2.    The AKS follows the traditional rule that "willfully" requires that the defendant know his conduct is unlawful........26

B.    Hart's Novel Two-Step Approach Eviscerates the AKS's Scienter Requirement. ...........................................................30

    1.    Hart's two-step approach cannot be squared with this Court's definition of willfulness. ...............................30

    2.    Hart's authorities do not support his approach. ......................33

C.    *St. Junius* Is Unpersuasive and Is Not the Law In This or Any Other Circuit....................................................................37

D.    Hart's Policy Arguments Are Unpersuasive and Cannot Override the AKS's Text....................................................42

II.    The District Court Correctly Dismissed Hart's Complaints for Failure to Allege Plausibly that McKesson Knew that Providing the Spreadsheet-based Tools Violated the AKS....................................................43

    A.    Alleging General Knowledge of the Anti-Kickback Statute and of Conduct That a Plaintiff Later Alleges Violated the Statute Does Not Create a Plausible Inference of Scienter at the Time of the Conduct. ...........................................................43

    B.    The Scattershot Allegations of the Second Amended Complaint Did Not Cure Defects of the Initial Complaint. ...............................47

    1.    Alleged Document "Destruction" .............................................48

    2.    Hart's Alleged Conversations with Other Employees..............51

    3.    The McKesson Executive Email..............................................53

III.    This Court Should Reject Hart's New Theories for Salvaging His State-Law Claims.............................................................54

CONCLUSION .............................................................58

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*74 Pinehurst LLC v. New York*,
  59 F.4th 557 (2d Cir. 2023) .................................................................19

*Am. Surety Co. of N.Y. v. Sullivan*,
  7 F.2d 605 (2d Cir. 1925) ...................................................................40

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..................................................... 20, 44, 46, 48, 50, 53, 54

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).................................................................20, 53

*United States ex rel. Bilotta v. Novartis Pharms. Corp.*,
  50 F. Supp. 3d 497 (S.D.N.Y. 2014) ....................................................36

*United States ex rel. Bingham v. Baycare Health Sys.*,
  No. 14-cv-73, 2015 WL 4878456 (M.D. Fla. Aug. 14, 2015) ..........................37

*Browder v. United States*,
  312 U.S. 335 (1941)...........................................................................40

*Bryan v. United States*,
  524 U.S. 184 (1998)................................................ 13, 21, 24, 25, 26, 28, 39, 40

*United States ex rel. Cairns v. D.S. Med. LLC*,
  42 F.4th 828 (8th Cir. 2022) ..................................................................9

*United States ex rel. Camburn v. Novartis Pharm. Corp.*,
  No. 13-cv-3700, 2022 WL 4217749 (S.D.N.Y. Sept. 13, 2022)........................9

*Cheek v. United States*,
  498 U.S. 192 (1991)..........................................................................25

*Clark v. Martinez*,
  543 U.S. 371 (2005).........................................................................29

*In re DDAVP Direct Purchaser Antitrust Litigation*,
  585 F.3d 677 (2d Cir. 2009) ................................................................46

*Dixon v. United States*,
548 U.S. 1 (2006)...................................................................25, 28, 40

*United States ex rel. Fitzer v. Allergan, Inc.*,
No. 17-cv-668, 2021 WL 4133713 (D. Md. Sept. 10, 2021) ............................52

*United States ex rel. Forney v. Medtronic, Inc.*,
No. 15-cv-6264, 2017 WL 2653568 (E.D. Pa. June 19, 2017) ...........................8

*Gamma Traders I LLC v. Merrill Lynch Commodities, Inc.*,
41 F.4th 71 (2d Cir. 2022) .................................................................48

*United States ex rel. Gharibian v. Valley Campus Pharm., Inc.*,
No. 16-cv-4777, 2021 WL 5406148 (C.D. Cal. Oct. 12, 2021).................46, 50

*United States ex rel. Gohil v. Sanofi U.S. Servs. Inc.*,
No. 02-cv-2964, 2020 WL 4260797 (E.D. Pa. July 24, 2020).........................32

*Hanlester Network v. Shalala*,
51 F.3d 1390 (9th Cir. 1995) .............................................................6, 27

*United States ex rel. Health Choice Alliance, LLC v. Eli Lilly & Co.*,
4 F.4th 255 (5th Cir. 2021) ...................................................................8

*JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*,
412 F.3d 418 (2d Cir. 2005) ..................................................................55

*Krys v. Pigott*,
749 F.3d 117 (2d Cir. 2014) ..................................................................47

*United States ex rel. Ladas v. Exelis, Inc.*,
824 F.3d 16 (2d Cir. 2016) ...................................................................20

*Leocal v. Ashcroft*,
543 U.S. 1 (2004)................................................................................29

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015) .................................................................52

*United States ex rel. Martin v. Hathaway*,
63 F.4th 1043 (6th Cir. 2023) ............................................................7, 9

*United States ex rel. Pasqua v. Kan-Di-Ki LLC*,
  10-cv-965, 2012 WL 12895229 (C.D. Cal. June 18, 2012) ...............................37

*Patel v. Garland*,
  142 S. Ct. 1614 (2022) .......................................................................................43

*Pfizer, Inc. v. HHS*,
  42 F.4th 67 (2d Cir. 2022) .. 1, 2, 3, 4, 5, 7, 17, 21, 22, 24, 26, 30, 32, 33, 38, 39,
  40

*United States ex rel. Piacentile v. Novartis AG*,
  No. 04-cv-4265, 2011 WL 13234720 (E.D.N.Y. Feb. 8, 2011)...................50, 51

*Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*,
  11 F.4th 90 (2d Cir. 2021) .................................................................................56

*Ratzlaf v. United States*,
  510 U.S. 135 (1994)....................................................................................25, 26

*Safeco Ins. Co. of Am. v. Burr*,
  551 U.S. 47 (2007)..............................................................................................25

*United States ex rel. Schutte v. SuperValu, Inc.*,
  143 S. Ct. 1391 (2023)........................................................................................58

*United States ex rel. Silva v. VICI Mkting., LLC*,
  361 F. Supp. 3d 1245 (M.D. Fla. 2019)..............................................................37

*United States ex rel. Suarez v. AbbVie Inc.*,
  No. 15-cv-8929, 2019 WL 4749967 (N.D. Ill. Sept. 30, 2019) ..........................8

*United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.*,
  874 F.2d 20 (1st Cir. 1989)..................................................................................6

*United States v. Davis*,
  132 F.3d 1092 (5th Cir. 1998) ...........................................................................39

*United States v. Genesis Global Healthcare*,
  No. 18-cv-128, 2021 WL 4268279 (S.D. Ga. Sept. 20, 2021)...........................37

*United States v. George*,
  386 F.3d 383 (2d Cir. 2004) ........................................................................40, 41

*United States v. Goldman*,
    607 F. App'x 171 (3d Cir. 2015) ........................................................28

*United States v. Goodwin*,
    974 F.3d 872 (8th Cir. 2020) ........................................................35, 36

*United States v. Hagen*,
    60 F.4th 932 (5th Cir. 2023) ........................................................28, 39

*United States v. Hoskins*,
    44 F.4th 140 (2d Cir. 2022) ........................................................55

*United States v. Jain*,
    93 F.3d 436 (8th Cir. 1996) ........................................................6

*United States v. Kosinski*,
    976 F.3d 135 (2d Cir. 2020) ........................................................25, 26

*United States v. Kukushkin*,
    61 F.4th 327 (2d Cir. 2023) ........................................................26

*United States v. Lung Fong Chen*,
    393 F.3d 139 (2d Cir. 2004) ........................................................40

*United States v. McTizic*,
    972 F.3d 994 (8th Cir. 2020) ........................................................29

*United States v. Mittal*,
    36 F. App'x 20 (2d Cir. 2002) ........................................................27, 36

*United States v. Morgan*,
    380 F.3d 698 (2d Cir. 2004) ........................................................38

*United States v. Moshiri*,
    858 F.3d 1077 (7th Cir. 2017) ........................................................35, 36

*United States v. Nagelvoort*,
    856 F.3d 1117 (7th Cir. 2017) ........................................................29

*United States v. Njoku*,
    737 F.3d 55 (5th Cir. 2013) ........................................................39

*United States v. Nora*,
988 F.3d 823 (5th Cir. 2021) ........................................................39, 40

*United States v. Nowlin*,
640 F. App'x 337 (5th Cir. 2016) ........................................................36

*United States v. Patel*,
778 F.3d 607 (7th Cir. 2015) ........................................................38

*United States v. Ricard*,
922 F.3d 639 (5th Cir. 2019) ........................................................39

*United States v. Shvets*,
631 F. App'x 91 (3d Cir. 2015) (per curiam) ........................................6

*United States v. Sosa*,
777 F.3d 1279 (11th Cir. 2015) ........................................28, 34, 35

*United States v. St. Junius*,
739 F.3d 193 (5th Cir. 2013) ........................ 4, 14, 22, 27, 37, 38, 39, 40, 41

*United States v. Starks*,
157 F.3d 833 (11th Cir. 1998) ........................................6, 34, 35

*United States v. Strock*,
982 F.3d 51 (2d Cir. 2020) ........................................................20

*United States v. Teva Pharms. USA, Inc.*,
No. 13-cv-3702, 2019 WL 1245656 (S.D.N.Y. Feb. 27, 2019)........................42

No. 13-cv-3702, 2019 WL 13244252 (S.D.N.Y. July 1, 2019) ........................29

*United States v. Vernon*,
723 F.3d 1234 (11th Cir. 2013) ........................................34, 35

*United States v. Williams*,
218 F. Supp. 3d 730 (N.D. Ill. 2016)........................................6

*Wooden v. United States*,
142 S. Ct. 1063 (2022)........................................................25

**Statutes**

31 U.S.C. § 3729(a)(1)(A) ........................................................9

42 U.S.C. § 1320a-7b(b) ............................................................1, 3

42 U.S.C. § 1320a-7b(b)(2) ...................................................5, 24, 32

42 U.S.C. § 1320a-7b(b)(2)(B) .....................................................5

42 U.S.C. § 1320a-7b(g) ...............................................................9

42 U.S.C. § 1320a-7b(h) .................................................6, 27, 41, 42

Conn. Gen. Stat. § 4-274(1) ........................................................57

Tex. Hum. Res. Code § 36.002 ....................................................54

Tex. Hum. Res. Code § 36.011 ...............................................54, 58

Va. Code Ann. § 32.1-315 ............................................................56

**Other Authorities**

*Court Rules*

Fed. R. Civ. P. 9(b) ..............................................19, 20, 50, 56, 57

2d Cir. R. 31.1(b)(2) ....................................................................27

*Legislative Materials*

155 Cong. Rec. S10852 (daily ed. Oct. 28, 2009) (statement of S. Kaufman) ................................................................................6, 28

H.R. Rep. No. 96-1167 (1980)......................................................31

*Administrative Materials*

42 C.F.R. § 1001.952 .....................................................................7

68 Fed. Reg. 23731, 23735 (May 5, 2003)..................................7, 8

85 Fed. Reg. 77684, 77687 (Dec. 2, 2020)....................................7

Ctrs. for Medicare & Medicaid Servs., ASP Pricing Files ......................................................................................10

OIG Adv. Op. No. 00-10, 2000 WL 35747420, at *4 (Dec. 15, 2000)....................8

OIG Adv. Op. No. 12-20, 2012 WL 7148096, at *2-3 (Dec. 12, 2012)....................8

### Other Materials

Black's Law Dictionary 1100 (7th ed. 1999) ............................................................38

Restatement (Second) of Torts...................................................................................37

## INTRODUCTION

The Anti-Kickback Statute ("AKS") imposes criminal penalties for "knowingly and willfully" paying or receiving "remuneration" to induce referrals or purchases of items or services reimbursed by a Federal health care program. 42 U.S.C. § 1320a-7b(b).

As this Court has recently explained, by limiting AKS liability to "willful[]" conduct, Congress chose to impose these penalties only on the defendant who "knows that his conduct is illegal." *Pfizer, Inc. v. HHS*, 42 F.4th 67, 77 n.8 (2d Cir. 2022). That conclusion follows from the well-established meaning of the word "willful" and has been confirmed by Congress, this Court, and every other court of appeals to consider the issue, with the exception of a single decade-old outlier decision from the Fifth Circuit. Accordingly, to plead a violation of the AKS, a plaintiff must allege factual matter supporting the plausible inference that the defendant knew that the at-issue conduct was unlawful.

After multiple opportunities to amend his complaint, clear instructions from the District Court, and a year of discovery, Plaintiff-Appellant Adam Hart fails to meet that burden. Hart alleges that Defendant-Appellee McKesson violated the AKS and thereby caused the submission of false claims in violation of the False Claims Act and state analogues. Unlike in many AKS cases, Hart does not allege that McKesson paid money to induce referrals or purchases of specific drugs. Rather,

Hart alleges that McKesson violated the AKS by providing its community-oncology-clinic customers with the "Margin Analyzer" and "Regimen Profiler"—two spreadsheet-based tools that compare McKesson's prices for prescription drugs to the publicly available, statutorily fixed rates at which Medicare reimburses for those drugs—to induce clinics to purchase drugs from McKesson, rather than from other distributors. As a result, Hart alleges "hundreds of millions of dollars' worth" of claims these healthcare clinics submitted for the drugs they chose to prescribe their patients were "false." JA257 (¶9). In a pair of well-reasoned opinions, the District Court correctly dismissed Hart's complaint for failure to plead that McKesson knew that providing its customers these tools was unlawful. SA1; JA216.

Hart's principal response is to try to reinvent the standard for pleading claims under the AKS. Hart argues that the Court should adopt one of two alternative rules. *First*, Hart proposes discarding the established meaning of "willfully," based on language from a single Fifth Circuit decision that read "willfully" to mean merely that the defendant acted deliberately. But that decision is inconsistent with this Court's recent decision in *Pfizer*, 42 F.4th at 77 & n.8, which is supported by Supreme Court and Second Circuit precedent and the decisions of numerous courts of appeals defining what it means to act "willfully," both generally and in the AKS.

*Second*, Hart claims that even under *Pfizer*'s standard, a plaintiff can plead that a defendant acted "willfully" by alleging that the defendant "(1) intentionally

-2-

provid[ed] something of value in connection with a medical purchase reimbursed by the government, (2) while knowing that it is illegal to provide things of value in connection with such purchases." Hart Br. 31. But that novel standard is untethered from the AKS: Just because something has "value" does not mean that it is necessarily "remuneration" that violates the AKS, and just because something of "value" is provided "in connection with" a purchase does not mean it was made "to induce" that purchase. *See* 42 U.S.C. § 1320a-7b(b). Moreover, that two-step shortcut would eviscerate the requirement that a plaintiff must allege that a defendant knew that his conduct was unlawful. It is not the case that anyone who knows about the AKS in general and provides something that a plaintiff later *alleges* was "remuneration" implicating the AKS, knew that what he was providing *was*, in fact, illegal "remuneration" or that he otherwise "kn[ew] that his conduct [wa]s illegal." *Pfizer*, 42 F.4th at 77 n.8.

Hart also argues that even under the correct legal rule, he adequately pleaded scienter. The District Court properly concluded that Hart's largely conclusory allegations that McKesson employees received AKS training and that McKesson knew that the tools had "value" were insufficient to plausibly allege that McKesson knew that providing customers these tools was unlawful. Hart attempted to stitch together an inference of scienter from a grab-bag of allegations, including (1) conversations Hart had with other sales employees about how the tools were

-3-

"unethical" or "inappropriate" or how McKesson's "sales practices" were inconsistent with its "compliance" policies; (2) an email between McKesson executives attaching more than 170 pages of content that in turn referred to the tools a few times in passing; and (3) criticisms of McKesson's document retention and groundless and conclusory allegations of document destruction. The District Court correctly concluded that these allegations did not raise a plausible inference that McKesson knew providing the tools to its customers was unlawful.

Finally, Hart argues that the District Court erred in dismissing his state-law claims, because those claims were premised on violations of state anti-kickback laws lacking the AKS's "willfully" scienter requirement. But that is not what Hart alleged in his complaint, nor has he properly raised this issue.

## ISSUES PRESENTED

1. Whether, as this Court recognized in *Pfizer v. HHS*, 42 F.4th 67, 77 & n.8 (2d Cir. 2022), and as numerous other courts of appeals have held, a defendant acts "willfully" under the AKS only when he knows his conduct is illegal, or, as a panel of the Fifth Circuit held in the outlier decision *United States v. St. Junius*, 739 F.3d 193 (5th Cir. 2013), merely knowingly engaging in allegedly prohibited conduct is sufficient.

2. Whether the District Court erred by requiring Hart to allege facts that created a plausible inference that McKesson knew that its conduct was illegal rather

than by adopting Hart's novel two-part rule that allows a plaintiff to allege only that a defendant paid something of alleged value and generally knew that kickbacks are unlawful.

3.  Whether the District Court erred in concluding that Hart failed to allege facts that created a plausible inference that McKesson "willfully" violated the AKS, because his attempts to plead scienter rested wholly on conclusory assertions and unreasonable inferences.

4.  Whether Hart can revive his state-law claims based on violations insufficiently alleged in his complaint and a theory raised only with respect to a single state in a footnote in opposition to McKesson's second motion to dismiss.

## STATEMENT OF THE CASE

### A.   Legal Background

#### 1.   The Anti-Kickback Statute

"[F]irst enacted ... in 1972 to combat fraud and abuse in connection with Medicare and Medicaid[,] [t]he AKS prohibits, in relevant part, 'knowingly and willfully offer[ing] or pay[ing] any remuneration' to 'induce' an individual to purchase a federally reimbursable healthcare product." *Pfizer*, 42 F.4th at 72 (quoting 42 U.S.C. § 1320a-7b(b)(2)(B)).  Violations of the AKS are punishable by up to 10 years' imprisonment and fines of up to $100,000.  42 U.S.C. § 1320a-7b(b)(2).  In keeping with these sanctions, "the [AKS] explicitly includes a high

-5-

scienter requirement—that the defendant 'knowingly and willfully' [offer or pay] the kickback." *United States v. Williams*, 218 F. Supp. 3d 730, 740 (N.D. Ill. 2016).

Prior to 2010, courts of appeals were divided over how to read the term "willfully." Some held that the term meant that a defendant could be liable only if he knew that his conduct was unlawful or wrongful. *E.g.*, *United States v. Starks*, 157 F.3d 833, 837-39 (11th Cir. 1998); *United States v. Jain*, 93 F.3d 436, 441 (8th Cir. 1996); *United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.*, 874 F.2d 20, 33 (1st Cir. 1989). But at least one court applied a heightened standard under which the defendant also had to know that he was violating the AKS in particular. *See Hanlester Network v. Shalala*, 51 F.3d 1390, 1400 (9th Cir. 1995); *see generally United States v. Shvets*, 631 F. App'x 91, 95-96 (3d Cir. 2015) (per curiam) (discussing split).

The Affordable Care Act of 2010 resolved that tension by amending the AKS to clarify that "a person need not have actual knowledge of [the AKS] or specific intent to commit a violation of [the AKS]." 42 U.S.C. § 1320a-7b(h); *see* 155 Cong. Rec. S10852, S10852-01, S10853 (daily ed. Oct. 28, 2009) (statement of S. Kaufman) (amendment intended to disapprove *Hanlester Network*'s "read[ing] [of] the term to require proof that the defendant *not only* intended to engage in unlawful conduct, *but also* knew of the particular law in question and intended to violate that particular law" (emphasis added)). Thus, as this Court has recognized, a defendant

violates the AKS when "he knows that his conduct is illegal, even if he is not aware of the exact statutory provision that his conduct violates." *Pfizer*, 42 F.4th at 77 n.8.

That scienter requirement—i.e., that the defendant know that his conduct is unlawful—is particularly significant because the AKS does not categorically prohibit every instance in which someone gives something "of value" to induce a referral or purchase.

For example, the AKS does not define the term "remuneration," and providing certain items or services of value may not constitute "remuneration" as required to violate the statute. *See, e.g.*, *United States ex rel. Martin v. Hathaway*, 63 F.4th 1043, 1047-52 (6th Cir. 2023) (rejecting argument that agreement not to hire a competitor was "remuneration").[1]  In particular, the Office of Inspector General for the Department of Health and Human Services ("OIG"), the office responsible for interpreting and enforcing the AKS, has advised that "[s]tanding alone, services that have no substantial independent value to the purchaser may not implicate the [AKS]."  OIG Compliance Program Guidelines for Pharm. Mfrs., 68 Fed. Reg. 23731, 23735 (May 5, 2003).  As examples, OIG discussed certain support services provided by pharmaceutical manufacturers, such as billing assistance and

---

[1] In addition, even when some payment or transfer would otherwise constitute "remuneration," it may be specifically protected by safe-harbors promulgated to avoid criminalizing various "relatively innocuous business arrangements."  85 Fed. Reg. 77684, 77687 (Dec. 2, 2020); *see* 42 C.F.R. § 1001.952.

reimbursement consultation that, while ostensibly having some value, do not implicate the AKS. *Id.; see also, e.g.*, OIG Adv. Op. No. 00-10, 2000 WL 35747420, at *4 (Dec. 15, 2000) (free assistance on insurance coverage and reimbursement levels for products standing alone "have no substantial independent value and do not implicate the [AKS]"). Similarly, OIG has found that certain items and services do not constitute "remuneration," and therefore do not implicate the AKS, because any "value" is not "independent" from the offeror's services. *See, e.g.*, OIG Adv. Op. No. 12-20, 2012 WL 7148096, at *2-3 (Dec. 12, 2012) (electronic interface had no independent value and therefore did not constitute remuneration that implicated the AKS). The government has dismissed False Claims Act ("FCA") actions premised on allegations about patient-education services, for example, in part due to lack of merit, citing that it had previously concluded that "patient-education services alone do not constitute illegal remuneration." *See, e.g.*, *United States ex rel. Health Choice Alliance, LLC v. Eli Lilly & Co.*, 4 F.4th 255, 268 (5th Cir. 2021). Further, courts have dismissed FCA actions where the relator failed to allege that the defendant offered substantial independent value to induce a purchase. *See, e.g.*, *United States ex rel. Suarez v. AbbVie Inc.*, No. 15-cv-8929, 2019 WL 4749967, at *8-10 (N.D. Ill. Sept. 30, 2019); *United States ex rel. Forney v. Medtronic, Inc.*, No. 15-cv-6264, 2017 WL 2653568, at *4 (E.D. Pa. June 19, 2017).

## 2. The False Claims Act

A private individual (the "relator") may sue over alleged violations of the AKS by bringing a *qui tam* action under the FCA. The FCA prohibits, among other things, "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). The AKS deems "a claim that includes items or services resulting from a violation of [the AKS]" to be "a false or fraudulent claim for purposes of" the FCA. 42 U.S.C. § 1320a-7b(g).[2]

To succeed on an FCA claim premised on AKS violations, the relator must plead and prove each of the elements of the purported AKS violation, including that the defendant acted "knowingly and willfully." *E.g.*, *United States ex rel. Camburn v. Novartis Pharm. Corp.*, No. 13-cv-3700, 2022 WL 4217749, at *3 (S.D.N.Y. Sept. 13, 2022).

## B. Factual Background[3]

Some prescription drugs are obtained at pharmacies and taken by patients at home, while others are administered to patients by healthcare providers in doctors'

---

[2] Hart attempts to smuggle into circuit precedent the erroneous notion that any claim that is "tainted" by an AKS violation is "false." Hart Br. 1. The AKS makes clear that only "a claim that includes items or services *resulting from* a violation of [the AKS]" is false for purposes of the FCA. *See* JA275 (¶57); 42 U.S.C. § 1320a-7b(g) (emphasis added). As two courts of appeals have concluded, the text of the AKS requires but-for causation, which is inconsistent with Hart's "tainted by" standard. *Martin*, 63 F.4th at 1052-53 (6th Cir.); *United States ex rel. Cairns v. D.S. Med. LLC*, 42 F.4th 828, 834-36 (8th Cir. 2022). At a minimum, the meaning of "resulting from" is a disputed issue that the court need not resolve in this appeal.

[3] This background is largely taken from Hart's SAC, JA251.

offices or outpatient clinics. JA267-68 (¶41). These healthcare practices commonly purchase the drugs from manufacturers (via wholesale distributors like McKesson) and then bill patients' insurers. JA268 (¶¶42-43). As required by statute, Medicare (the focus of Hart's complaints) reimburses provider-administered drugs based on a set markup to the drugs' "average sales price." JA268-69 (¶¶44-46). These reimbursement rates are set by HHS and published regularly on its public website,[4] and do not vary depending on what the specific provider actually paid for the drugs. *See* JA268 (¶44). Accordingly, a provider bears the risk that the Medicare reimbursement rate will fall below the provider's own costs. *See* JA285 (¶86).

McKesson[5] is a wholesale prescription-drug distributor that purchases medicines from various manufacturers and sells them to healthcare providers. JA268 (¶42). Hart alleges that McKesson has two separate divisions serving oncology customers: the U.S. Oncology Network ("USON"), which provides member healthcare practices with a variety of tools and services in exchange for management fees, and the "Open Market" division, which sells drugs to healthcare providers. JA269, 295 (¶¶49, 115).

---

[4] *See* https://www.cms.gov/medicare/medicare-part-b-drug-average-sales-price/asp-pricing-files.

[5] This brief refers to defendants-appellees—McKesson Corporation and two of its subsidiaries—collectively as "McKesson."

This appeal concerns McKesson's provision of two spreadsheet-based tools, the Margin Analyzer and the Regimen Profiler, to oncology practices that purchased drugs from McKesson's Open Market division.

The Margin Analyzer is a spreadsheet that compares (1) the cost for the customer to acquire a drug from McKesson (i.e., the McKesson price) with (2) publicly available Medicare reimbursement rates for the drugs. JA267-77 (¶¶ 59-61, 63).[6] The Margin Analyzer provides these comparisons for therapeutically interchangeable drugs within 10 different categories. JA277-78 (¶64). This comparison of truthful pricing information and publicly available reimbursement information gives healthcare practices visibility into the financial consequences of using different drugs. The Margin Analyzer provides one factual data point; it does not purport to advise doctors on which drugs are most appropriate to prescribe, which is a matter of medical judgment. JA279 (¶67).

Although Hart implies that the Margin Analyzer encourages providers to purchase drugs that cost Medicare more to reimburse, materials attached to his complaint indicate that the reverse is often true. *See, e.g.*, JA363 (NEULASTA cost Medicare $3,147.97/dose, yielding the provider a $626.59/dose profit, while

---

[6] Practices can also add their own data about the rates at which commercial insurers (e.g., Cigna) will reimburse those drugs. JA277 (¶62).

NEUPOGEN 480 MCG/1.6ML cost Medicare $4,103.25/dose but yielded only a $43.97/dose profit).

The Regimen Profiler is similar, except that it compares McKesson prices and publicly available reimbursement information for a treatment regimen, as opposed to on a drug-by-drug basis. JA293 (¶106). The Regimen Profiler also generates patient-level reports "that enable physicians to talk to patients about their out-of-pocket costs of care." *Id.*

## C. Procedural History

### 1. The government declined to intervene in Hart's 2015 *qui tam* action.

Adam Hart worked for McKesson for three years as a business development executive focused on community oncology clinics in the Southeast. JA260 (¶15). In February 2015, he filed this *qui tam* action alleging that McKesson's provision of the Margin Analyzer and Regimen Profiler to physicians' practices violated the AKS. Hart alleges that McKesson violated the AKS because (1) these tools constitute "remuneration" under the AKS; (2) McKesson provided them for free to healthcare practices that agreed to buy most of their drugs from McKesson, rather than other distributors; and (3) Medicare reimbursed some drugs purchased by these healthcare practices. Hart contends that any of the "hundreds of millions of dollars" of claims those healthcare practices submitted to Medicare and Medicaid after they received or were offered the two tools were "false claims" for purposes of the FCA

and dozens of analogous state false claims acts.  JA257, 275-76, 296, 315 (¶¶9, 57, 116, 153).

After reviewing and investigating the allegations of the complaint, the government declined to intervene in the action.  JA8.

### 2.    The District Court dismissed Hart's first amended complaint for failure to plead scienter.

Following the government's declination, Hart filed a first amended complaint (the "FAC"), which the District Court (Abrams, J.) dismissed in full on the ground that Hart had failed to plead that McKesson acted "willfully."[7]

*First*, the District Court followed the "majority of circuit courts to have addressed this issue, both before and after the 2010 Amendment" in holding that the AKS's use of "willfully" meant that to be liable, the defendant must have known that his conduct was unlawful.  JA239.  As the District Court explained, that interpretation of "willfully" is consistent with both the "traditional" understanding of the term and with the text and legislative history of the 2010 Amendment to the AKS in particular.  *Id.* (quoting *Bryan v. United States*, 524 U.S. 184, 196 (1998)). The District Court rejected Hart's effort to persuade the Court to instead follow the

---

[7] The District Court concluded that Hart adequately pleaded that McKesson's provision of the tools could constitute "remuneration," though it acknowledged that it was a "closer question" whether the tools provided "independent" value and declined to take judicial notice of substantially similar tools offered by McKesson's competitors.  JA229-37.

lone outlier decision in *United States v. St. Junius*, 739 F.3d 193 (5th Cir. 2013). JA241-43.

*Second*, the District Court concluded that the complaint lacked "any allegations from which the Court can plausibly infer that McKesson knew providing these tools to commitment program customers was unlawful." JA244. Although Hart had alleged that the tools could constitute "remuneration" and that McKesson was aware of the AKS, the court explained that "[a]llegations that McKesson knew remuneration to induce purchases was prohibited in general, however, cannot alone support a finding that McKesson knew *this particular course of conduct* was unlawful." *Id.* (emphasis added). The complaint "lack[ed] allegations of the type that courts have found to support an inference of scienter." JA244-45. Indeed, the complaint "arguably suggest[ed] the opposite" by alleging that the tools were "openly advertised and widely discussed both within the company and among [McKesson's] customers." JA245. The District Court dismissed the FAC in full with leave to amend. JA250.

### 3. The District Court dismissed the second amended complaint, again for failure to plead scienter.

In response, Hart filed a second amended complaint ("SAC") adding allegations that he claimed supported an inference that McKesson acted "willfully." "[I]n addition to naming additional practices which were given the Margin Analyzer and Regimen Profiler," SA11, and adding further allegations about McKesson's

-14-

knowledge that the tools had value, *e.g.*, JA298-311 (¶¶120-22, 126, 128-29, 131-41), the SAC included two new Sections. The first Section, called "Additional Allegations of Scienter," contained allegations, like those the District Court had already rejected, about McKesson employees' "general awareness of the laws regulating the pharmaceutical industry," JA245, McKesson executives' knowledge that the tools had value, and supposed conversations between Hart and other McKesson employees. The second Section concerned McKesson's purported failure to retain certain documents. JA317-22 (¶¶156-170).

McKesson moved to dismiss the SAC in its entirety. The Court granted that motion on the grounds that Hart had failed to plead that McKesson acted with the requisite scienter.

The District Court again rejected Hart's efforts to plead that McKesson acted "willfully" through the "two-step approach" of alleging that the defendant "(1) knows that the AKS prohibits the provision of anything of value as an inducement, yet (2) engages in intentional conduct to provide things of value as inducements anyway." SA15. As the Court explained, Hart's complaint needed to "contain factual allegations from which [it] can plausibly infer that McKesson acted with the knowledge that its conduct ... was unlawful." SA15-16.

-15-

The District Court then proceeded to reject Hart's new allegations as insufficient to raise a plausible inference that McKesson knew that it was (supposedly) breaking the law.  SA17-27.

a.  *Alleged conversations between Hart and McKesson employees:*  The District Court held that Hart's alleged conversations with former colleagues were insufficient to allege that McKesson acted willfully.  SA11, 17-22.

*First*, Hart alleged that during a compliance training, he instant-messaged his supervisor to complain that "McKesson's current sales practices, which included using the Margin Analyzer and the Regimen Profiler as free inducements to secure purchase commitments, violated the compliance policies that were presented in the training session."  JA320 (¶164).  The District Court concluded that Hart's expression of "generalized compliance concerns" about "sales practices"—which were defined to include the conduct at issue in this suit only through "artful pleading"—to a regional manager did not support a plausible inference that *McKesson* believed that its *use of the Margin Analyzer and Regimen Profiler* was *unlawful*.  SA17-18.

*Second*, Hart alleged that he had conversations in which he and other McKesson employees discussed (i) how the tools were "unethical and wrongful" because they encouraged providers to prescribe higher-cost drugs; and (ii) how it was "inappropriate" to give Open Market customers free access to a tool developed

-16-

for the company's USON unit. JA320 (¶¶165-66). The District Court held that these conversations among sales employees were insufficient to plead what *McKesson* believed about the tools or that anyone "intentional[ly] violat[ed] ... a known legal duty." SA19 (quoting *Pfizer*, 42 F.4th at 77).

    *b. McKesson Executive Email:* The Court was "unpersuaded" that allegations about an email from McKesson executive Kirk Kaminsky to another McKesson executive "plausibly alleges knowledge of unlawfulness." SA19. Hart alleged that Kaminsky sent another executive an Ernst and Young analysis, prepared for USON, valuing the Margin Analyzer and Regimen Profiler as used in that division at $150,000, with the cover note "You didn't get this from me ... ok?" JA318 (¶160); *see also* JA309 (¶135). He alleged this email "indicat[ed] [Kaminsky's] knowledge that McKesson's provision of these value-added business tools for free (which USON provided for a fee) was wrongful and unlawful." JA318 (¶160).

    As the District Court recognized, the Kaminsky email attached multiple documents totaling 170 pages, "covering a range of materials," and mentioned the Margin Analyzer and Regimen Profiler only in passing, in a handful of buried references. SA20; *see* JA725-866. The District Court thus concluded that it was simply implausible that the cover email's vague statement "You didn't get this from me" (1) referred to the tools, specifically or (2) was written because the sender had any belief about the lawfulness of providing those tools. SA19-21.

   *c. McKesson Document Retention:*   The District Court concluded that although Hart "boldly allege[d]" that McKesson had purposefully destroyed documents relevant to this action, the SAC lacked any well-pleaded allegations that McKesson had "destroyed documents *in order to conceal conduct it knew was unlawful.*" SA12, 23 (emphasis added).

   In the SAC, Hart alleged that McKesson "destroyed" documents relevant to the action by failing to preserve certain emails, training documents, and a video from the at-issue period; removing references to the Margin Analyzer (but not the Regimen Profiler) from its website; and wiping the contents of Hart's laptop after he returned it to the company a year after he left McKesson.  JA42 (¶14).  The District Court concluded, however, that "these allegations do not give rise to the plausible inference that McKesson destroyed documents in order to conceal conduct it knew was unlawful," because "[a]part from conclusory allegations that the ostensible destruction of these materials is evidence of 'guilt' or that McKesson 'knew its conduct was wrongful,' ... the Complaint does not provide specific allegations to support the plausible inference that McKesson engaged in document destruction in order to conceal evidence which would demonstrate scienter under the AKS." SA23.  In addition, although the District Court did not rely on this fact, it noted that the Magistrate Judge assigned to oversee discovery in the action had also considered at least some of these accusations (in particular, those alleging McKesson

destroyed Hart's laptop to hide evidence) "and found them to be entirely unsupported."  SA23 n.6.

* * *

Even with "the benefit of multiple rounds of amendment" and "the Court's instruction," Hart did not allege that McKesson acted "willfully," as required to plead a violation of the AKS.  SA28.  Accordingly, the District Court dismissed the SAC, including Hart's state false-claims-act claims because those claims were premised on violations of the federal AKS.  SA16, 28.[8]  The District Court held that it was "conceivable" that Hart might be able to amend his complaint to allege violations of state false-claims laws premised on violations of *state* anti-kickback laws.  SA28.  Accordingly, it granted Hart leave to file a third amended complaint raising such state-law claims "should he have a good faith basis for doing so," though the court questioned whether it would have jurisdiction over a complaint raising only state-law claims.  SA28.  Hart instead asked the court to enter an appealable final judgment.

### STANDARD OF REVIEW

This Court reviews *de novo* the District Court's conclusion that the complaint failed to state a claim.  *74 Pinehurst LLC v. New York*, 59 F.4th 557, 562 (2d Cir.

---

[8] The District Court did not reach McKesson's argument that Hart had failed to allege a nationwide scheme with particularity as required by Rule 9(b).

2023). To state a claim for which relief can be granted, a plaintiff must allege factual matter supporting the reasonable inference that the defendant is liable. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[U]nadorned, the-defendant-unlawfully-harmed-me accusation[s]," "naked assertions devoid of further factual enhancement," "mere conclusory statements," and factual allegations that are "merely consistent with" the defendant's liability, *id.* at 678 (cleaned up), or raise only a "speculative" right to relief, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), are insufficient to withstand a motion to dismiss.

Where, as here, a plaintiff alleges violations of the False Claims Act and state analogues, the complaint must be pleaded with particularity under Federal Rules of Civil Procedure Rule 9(b). *United States v. Strock*, 982 F.3d 51, 66 (2d Cir. 2020). That means a plaintiff must "state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b), and set forth "particularized allegations of fact" rather than mere "conclusory statements" or "hypotheses," *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 26-27 (2d Cir. 2016). Although the plaintiff can plead knowledge generally, he "still must plead the factual basis which gives rise to a strong inference of fraudulent intent." *Strock*, 982 F.3d at 66 (quotation marks omitted).

-20-

## SUMMARY OF ARGUMENT

The District Court twice dismissed Hart's complaints for failure to allege facts creating a plausible inference that McKesson acted "willfully"—i.e., that it knew that its conduct was unlawful. SA1; JA216. That decision was correct and should be affirmed for three reasons.

I. The District Court correctly held that to plead a violation of the AKS, a plaintiff must allege facts giving rise to a plausible inference that the defendant knew its conduct was unlawful. This Court has expressly endorsed that reading of the AKS, explaining in *Pfizer v. HHS*, that a person can "willfully" violate the AKS if "he knows that his conduct is illegal." 42 F.4th 67, 77 & n.8 (2d Cir. 2022). Despite Hart's exhortations to the contrary, this standard is consistent with the text of the AKS, which uses a scienter term that the Supreme Court has defined on multiple occasions*, see, e.g.*, *Bryan v. United States*, 524 U.S. 184, 196 (1998), as well as with the legislative background of the AKS and other circuits' precedents.

Striving to circumvent that rule because he cannot satisfy it, Hart first proposes a novel standard under which a plaintiff could state a claim under the AKS by pleading only that the defendant "(1) intentionally provid[ed] something of value in connection with a medical purchase reimbursed by the government, (2) while knowing that it is illegal to provide things of value in connection with such purchases." *E.g.*, Hart Br. 31. That standard misapprehends the AKS, which

-21-

requires the provision of *remuneration to induce* a purchase. Even a defendant who knows about the AKS and pays "value in connection with" a healthcare purchase may have every reason to believe that his conduct is lawful. Moreover, Hart's proposed two-step standard would read out of the AKS the requirement that a defendant knows that his specific conduct is unlawful. Such a short-cut finds no support in the case law.

Alternatively, Hart contends that this Court should adopt the standard applied by a single panel of the Fifth Circuit in *United States v. St. Junius*, 739 F.3d 193 (5th Cir. 2013), that requires only that the defendant deliberately engage in the conduct that violates the AKS, regardless of whether he knows his conduct is unlawful. That decision is irreconcilable with *Pfizer*, inconsistent with prior and subsequent Fifth Circuit authority, and not a persuasive reading of the text, structure, or history of the AKS.

II. Applying the correct legal standard, the District Court correctly dismissed Hart's complaints for failure to plead that McKesson knew that the at-issue conduct was unlawful. Although Hart alleged that McKesson was generally aware of the AKS and knew that the Margin Analyzer and Regimen Profiler had "value," those allegations were insufficient to create a plausible inference that McKesson actually understood that by providing those tools, it was "violati[ng] ... a known legal duty." *See Pfizer*, 42 F.4th at 77 & n.8. As the District Court concluded, Hart's attempts to

create an inference of scienter with allegations that various McKesson employees viewed provision of the tools as unethical or inappropriate, that one McKesson executive sent another an email with the statement "you didn't get this from me" attaching 170 pages of documents that obliquely referenced the tools only a handful of times, and that McKesson did not retain certain documents failed to create a plausible inference that McKesson believed that providing the tools to healthcare practices was unlawful. The court also noted that the complaint "arguably suggest[ed] the opposite" by alleging that the tools were "openly advertised and widely discussed both within the company and among [McKesson's] customers." JA245.

III. The Court should disregard Hart's belated and cursorily argued effort to revive his state-law *qui tam* claims on the theory that claims submitted to the states were false because McKesson violated state anti-kickback laws. Hart failed to allege facts supporting that theory or to properly raise it in the District Court or this Court. And in any event, Hart's Connecticut- and Texas-law claims—the only ones even arguably still at issue—are insufficiently pleaded.

## ARGUMENT

### I. A Defendant Does Not Violate the Anti-Kickback Statute Unless He Knows His Conduct Is Unlawful.

#### A. The AKS Imposes Liability Only in Cases in Which the Defendant Knows His Conduct Is Unlawful.

In relevant part, the AKS prohibits "knowingly and willfully offer[ing] or pay[ing] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person ... to purchase ... any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2). The statute thus restricts liability to only those who act "knowingly and willingly." *Id.* Hart argues that in 2010 "Congress made clear that the AKS willfulness standard does not require knowledge of illegality." Hart Br. 40. As this Court already recognized, Hart is wrong. *See Pfizer*, 42 F.4th at 77 & n.8. Under the well-established meaning of "willfully," to plead a violation of the AKS, a plaintiff must allege factual matter that creates the plausible inference that the *defendant knew what he was doing was unlawful*.

#### 1. At minimum, "willfully" requires knowledge that one's conduct is unlawful.

"The word 'willfully' is sometimes said to be a word of many meanings whose construction is often dependent on the context in which it appears." *Bryan v. United States*, 524 U.S. 184, 191 (1998) (quotation marks omitted). When used in a civil

statute, the term can include "not only knowing violations of a standard, but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007). But when "willfully" is used in a criminal statute, at minimum, "the Government must prove that the defendant acted with knowledge that his conduct was unlawful." *Bryan*, 524 U.S. at 191-92 (quoting *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994)).[9] It is not enough that the defendant is aware "of the facts that constitute the offense"; he must have "acted with knowledge that his conduct is unlawful." *Dixon v. United States*, 548 U.S. 1, 5 (2006) (quotation marks omitted). As this Court has recognized, this "definition of willfulness is generally applicable" and not limited to the particular statute at issue in *Bryan*. *United States v. Kosinski*, 976 F.3d 135, 154 (2d Cir. 2020).

Importantly, when used in a criminal statute, "willfully" requires *at least* that the defendant know his conduct is unlawful. The Supreme Court has recognized two potential standards for "willfully" when used in a criminal statute: (1) that the defendant know his conduct is unlawful; or (2) that the defendant know his conduct is unlawful *because* it violates the specific statutory provision he is later charged with violating. *See, e.g.*, *Bryan*, 524 U.S. at 194 (discussing *Cheek v. United States*,

---

[9] *See also, e.g.*, *Wooden v. United States*, 142 S. Ct. 1063, 1076 (2022) (Kavanaugh, J., concurring) ("[W]ith respect to federal crimes requiring 'willfulness,' the Court generally requires the Government to prove that the defendant was aware that his conduct was unlawful.").

498 U.S. 192, 201 (1991), and *Ratzlaf*, 510 U.S. at 138). While the second, "heightened" standard applies only in the context of certain "highly technical statutes that present[] the danger of ensnaring individuals engaged in apparently innocent conduct," the traditional rule still requires that the defendant know what he is doing is unlawful. *Bryan*, 524 U.S. at 194. This Court has recognized this framework. *See United States v. Kukushkin*, 61 F.4th 327, 332-33 (2d Cir. 2023) (discussing both the ordinary and "heightened" meanings of "willfully"); *Kosinski*, 976 F.3d at 154 (same).

### 2. The AKS follows the traditional rule that "willfully" requires that the defendant know his conduct is unlawful.

As this Court has recently confirmed, the AKS, as amended in 2010, adopted the traditional understanding of "willfully" as imposing liability only when a defendant knows his conduct is unlawful. In *Pfizer*, this Court explained in relevant part that the AKS's "willfully" term required the "voluntary, intentional violation of a known legal duty." 42 F.4th at 77 (quotation marks omitted). Under that understanding, "a person can 'willfully' violate a statute as long as he knows that his conduct is illegal, even if he is not aware of the exact statutory provision that his conduct violates." *Id.* at 77 n.8 (citing *Bryan*, 524 U.S. at 190).

Hart resists *Pfizer*'s reasoning, arguing that Congress amended the AKS in 2010 to eliminate the requirement that a defendant know his actions were unlawful. Hart Br. 38 n.12, 40. Hart's argument mischaracterizes the background of the 2010

Amendment, which directly supports *Pfizer*'s reasoning. In 2010, Congress was not legislating against a background of division over whether "willfully" meant only that the defendant acted deliberately (the *St. Junius* outlier standard) versus that the defendant knew his conduct violated the law. Rather, it adopted the 2010 Amendment to resolve a circuit split over whether the defendant needed to know that his conduct was unlawful (the traditional understanding of "willfully," which several courts of appeals had adopted) or instead that the conduct violated the AKS in particular (the heightened definition adopted by the Ninth Circuit in *Hanlester Network*). *See supra* pp. 6-7, 25-26.[10] Congress resolved that conflict by clarifying that to be liable under the AKS for acting "knowingly and willfully," a defendant "need not have actual knowledge of *this section* or specific intent to commit a violation of *this section*" (i.e., the AKS). 42 U.S.C. § 1320a-7b(h) (emphasis added). That amendment clarified that the AKS followed the traditional understanding of willfully—that the defendant needed to know that his conduct was unlawful—not the heightened rule.

---

[10] *See also* JA238-39 (noting that the court in *United States v. Mittal*, 36 F. App'x 20, 21 (2d Cir. 2002), had observed there was some disagreement among courts as to whether the government needed to prove that the defendant "knew what he was doing was illegal" or also that he was violating the specific statute he later was charged with violating, but declined to enter the fray because the evidence sufficed to sustain the conviction under either theory). *Mittal* is noted here notwithstanding Circuit Rule 31.1(b)(2) because it was cited in the District Court's opinions. SA26; JA238-39.

The text of the 2010 Amendment underscores this conclusion. *First*, Congress left the term "willfully" in the statute after multiple Supreme Court decisions had held that "willfully" requires that the defendant at least know his conduct is unlawful. *See, e.g.*, *Dixon*, 548 U.S. at 5; *Bryan*, 524 U.S. at 191-92. *Second*, had Congress intended to absolve plaintiffs of the obligation to plead and prove that the defendant knew his conduct was unlawful, it could have stated just that, as opposed to specifying that knowledge of *the AKS* or intent to violate *the AKS*, in particular, were not elements of the AKS. A statement in the legislative record confirms that Congress "sought to "address[] confusion in the case law" by disapproving the Ninth Circuit's "read[ing] [of] the term to require proof that the defendant *not only* intended to engage in unlawful conduct, *but also* knew of the particular law in question and intended to violate that particular law." 155 Cong. Rec. S10852, S10852-01, S10853 (daily ed. Oct. 28, 2009) (statement of S. Kaufman) (emphasis added).

Moreover, this Court's interpretation of "willfully" in the AKS to require knowledge that the conduct is illegal aligns with the broad consensus of courts since 2010. *See, e.g.*, *United States v. Hagen*, 60 F.4th 932, 943 n.3 (5th Cir. 2023) (defendant must act "with the specific intent to do something the law forbids, meaning a bad purpose either to disobey or disregard the law" (citation omitted)); *United States v. Sosa*, 777 F.3d 1279, 1293 (11th Cir. 2015) (same); *United States*

*v. Goldman*, 607 F. App'x 171, 174-75 (3d Cir. 2015) (defendant must have known "his conduct was unlawful and intend[] to do something the law forbids"); *see also United States v. McTizic*, 972 F.3d 994, 996-97 (8th Cir. 2020) (defendant must know conduct is "unjustifiable and wrongful," which the court equated with knowledge of illegality); *United States v. Nagelvoort*, 856 F.3d 1117, 1126 (7th Cir. 2017) (evidence sufficient to sustain guilty verdict because "jury could have concluded that both appellants knew the contracts were illegal").[11]

The fact that a violation of the AKS—a criminal statute—can *also* lead to civil liability under the FCA is immaterial. To plead an FCA claim premised on a violation of the AKS, a plaintiff must plead an underlying violation of the AKS, which requires pleading that the defendant knew that his conduct was unlawful. The statute's single scienter provision must have the same meaning across applications, and "[t]he lowest common denominator"—here, criminal law's traditional application of "willfully"—"must govern." *Clark v. Martinez*, 543 U.S. 371, 380 (2005); *see also Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004).

---

[11] *See also, e.g.*, *United States v. Teva Pharms. USA, Inc.*, No. 13-cv-3702, 2019 WL 13244252, at *16 (S.D.N.Y. July 1, 2019) ("willfully" requires that defendant acted "with knowledge that its conduct was unlawful and the specific intent to do something that the law forbids").

**B.    Hart's Novel Two-Step Approach Eviscerates the AKS's Scienter Requirement.**

The District Court correctly held that, to plead a violation of the AKS, Hart needed to allege "facts that give rise to a plausible inference that McKesson knew its conduct was unlawful." JA241, 243; SA14. Hart argues that it suffices to allege that McKesson "(1) intentionally provid[ed] something of value in connection with a medical purchase reimbursed by the government, (2) while knowing that it is illegal to provide things of value in connection with such purchases." Hart Br. 31; *see also id.* at 31-37. Hart's two-step shortcut is insufficient as a matter of logic or precedent to plead that a defendant knew his conduct was unlawful.

**1.    Hart's two-step approach cannot be squared with this Court's definition of willfulness.**

On its face, Hart's two-step theory is contrary to the traditional understanding of willfulness. To act "willfully," a defendant must know that what he is doing is unlawful. *See* Part I.A, *supra*. But under Hart's approach, the government or a private relator could sufficiently plead (and presumably prove) that the defendant acted willfully simply by alleging that the defendant intentionally engaged in a practice that the plaintiff later contends is unlawful, so long as the defendant knew generally about the AKS.

What is missing from that formulation is any requirement that the *defendant know that the specific conduct at issue is illegal*. *See Pfizer*, 42 F.4th at 77 n.8. In

effect, Hart's two-step approach would replace the statutory "willfulness" requirement with something akin to negligence or objective recklessness, under which it is enough that the defendant *should have realized* that his conduct could be unlawful. That approach flouts Congress's choice to employ a more demanding scienter standard in the AKS and risks imposing criminal or treble-damages civil liability on defendants who in good faith engage in conduct that is subsequently found to constitute an illegal kickback. The drafters of the AKS sought to avoid just such a possibility of "inadvertent" criminalization. H.R. Rep. No. 96-1167, at 411 (1980).

Hart downplays the unpalatable consequences of his two-step approach, arguing that the concept of "remuneration" under the AKS is so broad that anyone acquainted with the law would understand that giving or taking anything "of value" "in connection with" a medical purchase reimbursed by the government would understand that they are violating the law. But that argument oversimplifies the complex statutory and regulatory framework governing this area of the law and thereby eviscerates the "willfully" requirement.

*First*, as numerous courts and the government have recognized, not everything "of value" is "remuneration" that implicates the AKS. For example, regulators have stated that items or services that do not convey "substantial independent value" may not implicate the AKS. *See supra* pp. 7-8. Although such items or services may

-31-

have some "value" to the recipient, such as when a drugmaker offers providers information about insurance reimbursement, that does not make them illegal kickbacks. *See, e.g.*, *United States ex rel. Gohil v. Sanofi U.S. Servs. Inc.*, No. 02-cv-2964, 2020 WL 4260797, at *7-8 (E.D. Pa. July 24, 2020) ("information-based administrative support tied to a specific product" is typically not "remuneration"). Indeed, this case exemplifies how it may be debatable or uncertain whether or not particular tools or activities constitute "remuneration." JA232.

*Second*, the payment of remuneration "in connection with" a reimbursable healthcare purchase does not necessarily violate the AKS. *Compare* Hart Br. 31, 32, 35, with 42 U.S.C. § 1320a-7b(b)(2). Instead, as Hart admits elsewhere in his brief, *e.g.*, Hart Br. 30, and this Court has recognized, *Pfizer*, 42 F.4th at 74-76, the AKS prohibits the knowing and willful payment of remuneration "to induce" a purchase, 42 U.S.C. § 1320a-7b(b)(2).

Accordingly, even if someone allegedly provides something "of value," that may not, in fact, be unlawful, regardless of whether it is provided to allegedly induce a healthcare purchase or "in connection with" a healthcare purchase (a version of Hart's test that is even further disconnected from the AKS's text). And the provider of that value may reasonably believe that he did not do something illegal, even if he is generally aware that the law prohibits certain healthcare-related kickbacks. Hart's two-step approach elides those nuances and assumes that anyone who knows about

-32-

healthcare law and engages in conduct that a relator later alleges to be a prohibited kickback *necessarily* knew that his conduct was illegal.

The fallacy of Relator's logical leap is well-illustrated by the shortcomings in his SAC. He would have this Court assume that McKesson must have known the provision of these two specific tools was unlawful. But, after a year of discovery and an opportunity to amend with the District Court's clear instructions, Hart has not identified evidence that plausibly leads to the inference that McKesson knew it was acting illegally. *See* Part II, *infra*.

### 2. Hart's authorities do not support his approach.

Hart does not identify a single decision that supports his novel two-step approach. Although he asserts that *Pfizer* "suggested" his two-step test, Hart Br. 31, *Pfizer* did no such thing. Instead, that decision clearly states—in language Hart fails to reckon with—that "a person can 'willfully' violate a statute *as long as he knows that his conduct is illegal*." 42 F.4th at 77 n.8 (emphasis added). Consistent with the widely accepted understanding of "willfully," *see* Part I.A.1, *supra*, that language correctly focuses the scienter inquiry on whether the defendant knew he was breaking the law, not, as Hart would have it, on largely distinct inquiries into whether the defendant knew about (1) his conduct and (2) the law.

Nor do the handful of out-of-circuit cases cited by Hart support his test. Although Hart claims that the Eleventh Circuit has "explicit[ly]" endorsed his

approach, the cases he cites undermine his theory. Those decisions hold that to act "willfully," the defendant must act "voluntarily and purposely, with the specific intent to do something the law forbids, that is with a bad purpose, either to disobey or disregard the law." *United States v. Sosa*, 777 F.3d 1279, 1293 (11th Cir. 2015) (quoting *United States v. Vernon*, 723 F.3d 1234, 1256 (11th Cir. 2013)); *accord Starks*, 157 F.3d at 838. And in *Sosa* and *Vernon*—unlike in this case—there was strong evidence that the defendants knew that their *specific conduct* was unlawful. In *Sosa*, the defendant falsified records to conceal the true purpose of at-issue payments and admitted knowing that the money was being used in a way that was illegal. 777 F.3d at 1294. Likewise, in *Vernon*, one defendant paid a third party for patient referrals knowing that the AKS "criminalizes *such* commission-based arrangements," while the other took efforts to conceal the payments, and continued making payments even after a lawyer told him that they did not fit within an AKS safe-harbor. 723 F.3d at 1256, 1259, 1267-70.[12]

Seizing on language from *Sosa* and *Vernon*, Hart argues that in the Eleventh Circuit, "the defendant need not have known that a specific referral arrangement violated the law." Hart Br. 32 (quoting *Sosa*, 777 F.3d at 1293). Read in context, however, this statement means only that the government or relator does not need to

---

[12] *Starks* clarified the legal standard but did not address what allegations or evidence sufficed to plead or prove an AKS violation. 157 F.3d at 837-39.

establish that the defendant knew his conduct *violated the AKS*. *Vernon*—the original source of this language—quoted in part from a paragraph in *Starks* that teed up the question presented in that case: whether the defendant needed to know he was violating the law generally or violating the AKS in particular. *See Vernon*, 723 F.3d at 1256 (citing *Starks*, 156 F.3d at 837-38). *Starks* nowhere suggested a defendant could be liable without knowing that his specific conduct was unlawful. Nor does Hart explain how a defendant *could* act "voluntarily and purposely, with the specific intent to do something the law forbids, that is with a bad purpose, either to disobey or disregard the law," as *Sosa*, *Vernon*, and *Stark* all require, *without* knowing that his specific conduct was unlawful. *E.g.*, *Sosa*, 777 F.3d at 1293.

Hart's reliance on *United States v. Moshiri*, 858 F.3d 1077 (7th Cir. 2017), and *United States v. Goodwin,* 974 F.3d 872 (8th Cir. 2020) is similarly unavailing. Those cases apply the traditional rule that the defendant must know that his conduct is unlawful to facts involving obvious AKS violations. In *Moshiri*, the Seventh Circuit did not explicate the term "willfully," but held only that the evidence presented in that case—which included the defendant's admission to an FBI agent that his sham "teaching" contract with a hospital was "basically paying [him] for patients" he referred—sufficed to sustain his AKS conviction. 858 F.3d at 1082-83. Similarly, in *United States v. Goodwin*, the Eighth Circuit applied its version of the traditional rule and found the scienter element satisfied by evidence that the

defendant concocted a scheme in which his nonprofit gathered blood and urine samples, found doctors who would attach their names to the specimens despite not knowing the patients, ignored instructions from a hired billing expert that Medicare required the samples to be linked to the requesting physicians, and then sold the specimens to a laboratory that billed Medicare for performing medically unnecessary tests on them. 974 F.3d at 873-76. These cases, which involve straightforward AKS violations and intentional deception, are readily distinguishable.

To be sure, allegations that a defendant paid straightforward kickbacks and knew the law prohibits paying kickbacks might in some circumstances sustain an inference that the defendant knew that what he was doing was unlawful or wrongful. But that does not mean, as Hart would apparently have it, that allegations that a defendant knew about the AKS and engaged in some conduct that a relator later alleges was prohibited by that law *necessarily* trigger such an inference. As the District Court noted, *Moshiri* and similar "cases in which there was no question that the defendant knew that direct payments to induce referrals violated the AKS" are "plainly inapposite to the allegations here." SA26 (citing also *Mittal*, 36 F. App'x 20; *United States v. Nowlin*, 640 F. App'x 337 (5th Cir. 2016)).[13]

---

[13] In a footnote, Hart stringcites various, mostly out-of-circuit and unpublished, district-court decisions that he claims support his two-step test. Hart Br. 34 n.10. Those cases offer him no support. In most, there were additional allegations (or evidence) the defendants knew their *specific conduct* was unlawful. For example, in *United States ex rel. Bilotta v. Novartis Pharms. Corp.*, 50 F. Supp. 3d 497, 519-20 (S.D.N.Y. 2014), the defendant allegedly held "sham" speaker events in violation

The Restatement (Second) of Torts also does not support Hart's two-step theory. Citing an explanatory comment from Section 8a, Hart argues that his theory accords with the rule that if one *knows* that certain consequences are substantially certain to result from one's act and proceeds, one is deemed to intend those consequences. Restatement (Second) of Torts § 8A, cmt. b (emphasis added); Hart Br. 35. Even assuming that the Torts Restatement is relevant to the interpretation of a federal criminal statute, it still requires one to *know* that consequences are substantially certain. Unless the defendant *knows* that his conduct is unlawful, he cannot act "willfully."

### C. *St. Junius* Is Unpersuasive and Is Not the Law In This or Any Other Circuit.

Alternatively, Hart invites this Court to reduce the AKS's scienter requirement even further by holding, based only on a decade-old outlier decision of the Fifth Circuit, that a defendant acts "willfully" so long as he deliberately engages

---

of company policy that was specifically designed to prevent AKS violations. In *United States ex rel. Pasqua v. Kan-Di-Ki LLC*, 10-cv-965, 2012 WL 12895229, at *5 (C.D. Cal. June 18, 2012), the defendant allegedly entered into a specific type of transaction that was "known throughout the healthcare industry" to be unlawful. In *United States v. Genesis Global Healthcare*, No. 18-cv-128, 2021 WL 4268279, at *12 (S.D. Ga. Sept. 20, 2021), the defendant's highest leaders had been warned that the conduct at issue was "suspect" and possibly illegal. And in *United States ex rel. Silva v. VICI Marketing, LLC*, 361 F. Supp. 3d 1245, 1253-54 (M.D. Fla. 2019), the defendant allegedly continued engaging in conduct despite knowing his lawyers failed to find a way it could comply with the AKS. Finally, *United States ex rel. Bingham v. Baycare Health System*, No. 14-cv-73, 2015 WL 4878456, at *6 (M.D. Fla. Aug. 14, 2015), addressed scienter only in passing, nor had the parties briefed the issue, *see, e.g.*, 2015 WL 9907497.

in conduct that is subsequently held to violate the AKS. Hart Br. 37-41 (discussing *United States v. St. Junius*, 739 F.3d 193 (5th Cir. 2013)).[14] This Court should reject *St. Junius* for at least three reasons.

*First*, *St. Junius* is irreconcilable with *Pfizer*. Although *St. Junius* arguably states that a defendant acts "willfully" merely by deliberately engaging in conduct that is held to violate the AKS, this Court has held, in a published decision, that a defendant cannot violate the AKS unless he "knows that his conduct is illegal." *Pfizer*, 44 F.4th at 77 n.8.

After initially trying to find support in *Pfizer*, Hart dismisses *Pfizer* as dicta. Hart Br. 4, 7, 27, 31, 38 n.12. But the relevant language from *Pfizer* is a holding, not dicta, because the Court needed to explain what "willfully" means in order to reject Pfizer's argument that the term requires "corrupt" intent. *Cf. United States v. Morgan*, 380 F.3d 698, 702 n.3 (2d Cir. 2004) (dicta is "judicial comment ... that is unnecessary to the decision in the case" (quoting Black's Law Dictionary 1100 (7th ed. 1999))).

Moreover, even if *Pfizer* were not controlling, it would still be persuasive authority. *See id*. Hart observes that the court did not address *St. Junius*, Hart Br. 38

---

[14] Hart also cites *United States v. Patel*, 778 F.3d 607 (7th Cir. 2015), but the language Hart quotes derives from a portion of the opinion addressing a different element of an AKS violation for soliciting or receiving kickbacks—i.e., whether the defendant received payments "in return for" referrals—not scienter.

n.12, but the fact that *Pfizer* did not address a largely unreasoned out-of-circuit decision does not negate its persuasive value. Insofar as Hart asserts that *Pfizer* relied principally on tax-fraud cases applying the heightened meaning of "willfully," he is wrong: *Pfizer* derived the traditional rule that a defendant acts willfully if he "knows that his conduct is illegal" from *Bryan*, 524 U.S. at 190, which explicitly refused to extend the heightened requirement that the defendant know the specific law he was allegedly violating from tax and currency-structuring cases to a firearms offense.

*Second*, as the District Court noted, it is not clear how "*St. Junius* fits into the Fifth Circuit's 'willfulness' jurisprudence." JA242. Prior to *St. Junius*, both before and after the 2010 Amendment, the Fifth Circuit itself had held that to "willfully" violate the AKS, a defendant must act "with the specific intent to do something the law forbids." *United States v. Njoku*, 737 F.3d 55, 64 (5th Cir. 2013) (quotation marks omitted); *see United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998). And since *St. Junius*, the Fifth Circuit has repeatedly applied that traditional understanding of "willfully." *See United States v. Hagen*, 60 F.4th 932, 943 (5th Cir. 2023); *United States v. Nora*, 988 F.3d 823, 830 (5th Cir. 2021); *United States v. Ricard*, 922 F.3d 639 (5th Cir. 2019). Indeed, in *Nora*, that court applied the traditional understanding to reverse an AKS conviction for insufficient evidence, explaining that the government had not produced evidence from which a rational

jury could conclude that the defendant knew the activities were unlawful. 988 F.3d at 831-35. This Court should not follow a Fifth Circuit case that other Fifth Circuit panels have apparently disregarded.

*Third*, *St. Junius* is unpersuasive as a reading of the text, structure, and history of the AKS, as are Hart's efforts to defend it. That decision fails to give "willfully" its ordinary meaning, i.e., that the defendant know that his conduct is unlawful. Citing a handful of outdated or off-point decisions, Hart argues that outside of "certain highly technical contexts," "willfully" requires only that the defendant "know[] what he is doing." Hart Br. 37-39.[15] That argument misapprehends the current state of the law and ignores *Dixon*, *Bryan*, and now *Pfizer*, which make clear that "willfully" by default means that the defendant knows what he is doing *is illegal*, and in "highly technical contexts" means that the defendant *also* knows what specific law he is breaking. *See* Part I.A.1, *supra*.

*St. Junius*'s interpretation also does not comport with the structure of the AKS. *See* Part I.A, *supra*. It essentially conflates "willfully" and "knowingly," *see Bryan*,

---

[15] *American Surety Co. of New York v. Sullivan*, 7 F.2d 605, 606 (2d Cir. 1925), arose from a civil action against a public officer for neglect of duty, while *Browder v. United States*, 312 U.S. 335, 342 (1941), *United States v. Lung Fong Chen*, 393 F.3d 139, 147 (2d Cir. 2004), and *United States v. George*, 386 F.3d 383, 389 (2d Cir. 2004), arose from different statutes prohibiting false statements on passport applications and misapplication of bank funds, and predate this Court's and the Supreme Court's subsequent clarification of the meaning of the word "willfully."

-40-

524 U.S. at 193, and as a result renders the AKS's "knowingly and willfully" scienter requirement redundant.[16]

*Fourth*, *St. Junius* and Hart misapprehend the significance of the 2010 Amendment. The *St. Junius* panel reasoned that because Congress eliminated any requirement that the defendant know about or intend to violate *the AKS* specifically, Congress must have meant to reduce the "willfully" scienter requirement to simple deliberate action. 739 F.3d at 210. The panel wholly disregarded a third option, confirmed by both text and legislative history: Congress rejected the Ninth Circuit's holding that a defendant must know about or intend to violate the AKS, specifically, and codified the other Circuits' consensus view that the defendant need know only that his conduct is unlawful. *See supra* pp. 6-7, 26-29.

Hart argues that this Court should overlook the plain language of Section 1320a-7b(h) because the AKS is the only federal statute that prohibits Medicare- and Medicaid-related kickbacks, and so, when Congress specified that an AKS violation does not require knowledge of or specific intent to violate "this section"—i.e., the AKS—Congress really meant to excuse plaintiffs from pleading or proving intent to violate the law generally. Hart Br. 40. That argument is not

---

[16] Although this Court rejected such an argument in *George*, 386 F.3d at 395, that decision specifically concerned the scienter requirement in a particular statute prohibiting making false statements on passport applications. Criminalizing lying on a passport application poses far less risk of ensnaring the innocent than does the AKS.

only logically questionable, but also rests on a false premise. Kickback-related activity may also violate other laws, including laws related to healthcare fraud, wire fraud, physician self-referrals, bribery, and state law. Section 1320a-7b(h) thus means that the AKS reaches a defendant who pays a kickback knowing that his conduct violates some law, regardless of whether he knows that the AKS prohibits it. Contrary to Hart's arguments, however, the statute does *not* reach a defendant who deliberately provides something believing it to be lawful but only later finds out it constitutes a prohibited kickback.

### D. Hart's Policy Arguments Are Unpersuasive and Cannot Override the AKS's Text.

Hart falls back on a policy argument that requiring a defendant to know that his conduct is unlawful would make it too easy for wrongdoers to evade liability, Hart Br. 44-45, but Hart's concern is misplaced. A defendant who learns that his current practices are illegal, then tweaks them slightly may still have acted "willfully" if he believes that the new practice is also illegal. To the extent Hart complains that it is too difficult to plead an AKS violation, he is incorrect. Any difficulty in pleading an AKS violation has not deterred large numbers of relators from bringing (and sometimes winning) FCA actions premised on violations of the AKS. *See, e.g.*, *United States v. Teva Pharms. USA, Inc.*, No. 13-cv-3702, 2019 WL 1245656, at *5 (S.D.N.Y. Feb. 27, 2019). Hart's policy argument is best directed at Congress, which explicitly limited the AKS to "willful" violations of kickback law.

Hart's "policy concerns cannot trump the best interpretation of the statutory text."

*Patel v. Garland*, 142 S. Ct. 1614, 1627 (2022).

## II.  The District Court Correctly Dismissed Hart's Complaints for Failure to Allege Plausibly that McKesson Knew that Providing the Spreadsheet-based Tools Violated the AKS.

Applying these well-established principles, the District Court twice dismissed Hart's complaints for failure to plead that McKesson acted willfully—i.e., that it knew it was violating the law.  This Court should affirm for the sound reasons given by the District Court.

### A.  Alleging General Knowledge of the Anti-Kickback Statute and of Conduct That a Plaintiff Later Alleges Violated the Statute Does Not Create a Plausible Inference of Scienter at the Time of the Conduct.

As the District Court correctly concluded, Hart's allegations that McKesson generally knew about the AKS and the prohibition against providing kickbacks as inducements are insufficient to plead that McKesson knew it was violating the law. JA243-46; SA15-16.  Hart alleges, for example, that McKesson employees undergo annual training about the AKS.  JA257, 317 (¶¶9, 157).  But such "[a]llegations that McKesson knew remuneration to induce purchases was prohibited *in general*, however, cannot alone support a finding that McKesson knew this particular course of conduct was unlawful."  JA244 (emphasis added).

Put differently, just because one knows of the AKS, does not mean that one knows that his conduct violates that law or any other law.  This is especially true

when, as here, there is no allegation that the specific conduct has been clearly recognized as unlawful by internal policies, legal advice, industry guidance, or case law. McKesson is not alleged to have made "direct payments to induce referrals," SA26, but instead to have provided spreadsheets comparing its price for the products it distributed with publicly available data about the fixed rates at which Medicare would reimburse providers for those products.

Even assuming for purposes of the motion to dismiss that those tools had "value," it is at the very least a "closer question" whether the tools—which combine publicly available information and McKesson prices for therapeutically equivalent drugs—had the *type of independent value* that the government and courts have found qualify as "remuneration" that implicates the AKS. JA232; *see* McKesson Mot. to Dismiss at 7-20, DC Dkt. No. 52; *supra* pp. 31-33.

Hart's various allegations that McKesson knew that these tools had value, JA295 (¶¶115-42), do not change this analysis. To the extent Hart claims McKesson knew these tools had "significant" or "significant independent value," those conclusory allegations are not taken as true. *See Iqbal*, 555 U.S. at 678. JA255, 295, 296, 311 (¶¶3, 112, 117, 142). Nor do Hart's allegations that McKesson knew the tools had some "value" support a plausible inference that McKesson knew they had the type of value implicating the AKS or that provision of the tools was unlawful.

-44-

Further, although Hart repeatedly asserts that McKesson knew from a third-party analysis that the Margin Analyzer and Regimen Profiler had "market value" of $125,000 and $25,000, respectively, the documents he references demonstrate that those valuations refer to the value of "consulting" services that USON provided to a specific practice using those and various other tools. *Compare* JA309 (¶135), *with* JA541, 546, 551, 681. Those allegations cannot support a plausible inference that McKesson knew that those tools had "value" when provided to *Open Market* customers, let alone that the tools constituted "remuneration" that implicated the AKS and that McKesson's provision of them was unlawful. Similarly, to the extent that Hart alleges that anyone at McKesson made statements that these tools had value or described the tools (along with a set of nearly two dozen other tools or services, JA732-38) as "value-added," the SAC is devoid of well-pleaded allegations that McKesson recognized that those tools, which combined McKesson prices and publicly available reimbursement information, (allegedly) had value independent of McKesson's distribution service, let alone recognized that providing those tools to *Open Market* customers (allegedly) was unlawful. The requisite well-pleaded allegations bridging the gap between general AKS knowledge and knowledge that provision of the specific at-issue tools was illegal are absent here. JA244.

Moreover, Hart's Complaints included allegations that undermined the plausibility of scienter. For example, Hart alleged that these free tools were "openly

advertised and widely discussed," suggesting that McKesson thought they were lawful. JA245 (citing *United States ex rel. Gharibian v. Valley Campus Pharm., Inc.*, No. 16-cv-4777, 2021 WL 5406148, at *3 (C.D. Cal. Oct. 12, 2021)); SA22.[17]

Hart argues that the District Court erroneously imposed a "heightened pleading standard" and required him to allege specifically that McKesson concealed its conduct or ignored the advice of counsel. Hart Br. 42-45. Neither argument is correct. *First*, by requiring Hart to allege facts that created a plausible inference that McKesson knew its conduct was unlawful—an essential element of an AKS violation—the District Court simply held Hart to the standards of federal-court pleading rules. *See Iqbal*, 556 U.S. at 678.[18] *Second*, to the extent Hart contends that the District Court *required* him to allege either concealment or disregard of legal advice, he misreads its first decision. That decision simply observed that to create a plausible inference of scienter, a plaintiff needed to allege something more than that the defendant generally knew about the AKS, "*such as* actions taken to conceal the

---

[17] Although Hart suggests that concealment (or lack thereof) is irrelevant to a finding of scienter because the AKS prohibits kickbacks that are made "overtly or covertly," the "overtly or covertly" requirement is distinct from the statute's scienter requirement. For example, an "overt" kickback can be made willfully, and a "covert" kickback may be made without scienter.

[18] To the extent Hart contends that he needed to allege only that McKesson "should have known" that its conduct violated the AKS, Hart Br. 43, he is wrong. The AKS requires willful misconduct, not recklessness, and the discussion in *In re DDAVP Direct Purchaser Antitrust Litigation*, 585 F.3d 677, 695 (2d Cir. 2009), of the standards for pleading a fraud claim under the *Sherman Act* is inapposite.

fraudulent scheme, [or] notice from counsel ...."  SA21-22 (citations omitted and emphasis added).  By providing a non-exhaustive, exemplary list of the sorts of allegations that *could* create a plausible inference that McKesson knew its conduct was unlawful, the District Court did not imply that Hart was *required* to plead any particular allegation.  Accordingly, Hart fights a strawman in arguing why he should not have been required to plead concealment or disregard of the advice of counsel.

### B. The Scattershot Allegations of the Second Amended Complaint Did Not Cure Defects of the Initial Complaint.

After the District Court dismissed his FAC, Hart reprised these legally deficient allegations and added a grab-bag of further allegations in the SAC: (i) that McKesson "destroyed" documents related to the action; (ii) about conversations Hart had with other sales employees; and (iii) an email one McKesson executive sent another that said "You didn't get this from me ... ok?"  JA316-20 (¶¶155-66).  None of those allegations, viewed individually or together, give rise to a plausible inference that McKesson knew that providing access to the Margin Analyzer and Regimen Profiler was unlawful.

As a threshold matter, Hart argues at length that the District Court erred in dismissing the SAC because it failed to draw reasonable inferences in his favor and credited alternative explanations for McKesson's alleged conduct.  *Cf.* Hart Br. 45-52.  But the court was required to accept as true only non-conclusory "factual allegations, and the reasonable inferences that can be drawn therefrom."  *Krys v.*

*Pigott*, 749 F.3d 117, 128 (2d Cir. 2014). And it is settled that to survive a motion to dismiss, a plaintiff must "state a claim to relief that is plausible on its face," by pleading facts that, viewed in context and in light of "judicial experience and common sense," are more than merely "consistent with" the notion that the defendant is liable. *Iqbal*, 556 U.S. at 678-79. The District Court did not err in declining to credit Hart's conclusory allegations or refusing to accept as true implausible inferences that Hart asked the court to draw from those allegations. *See Gamma Traders I LLC v. Merrill Lynch Commodities, Inc.*, 41 F.4th 71, 78 (2d Cir. 2022) (no requirement to draw "unreasonable" inference in plaintiff's favor).

### 1. Alleged Document "Destruction"

Hart's allegations that McKesson "destroyed" documents *because* it was trying to conceal evidence about the Margin Analyzer and Regimen Profiler *because* it knew its provision of those tools was unlawful rest on nothing more than conclusory statements, bare assertions, and unsupported inferences that the District Court properly refused to credit.

*First*, Hart alleges that McKesson failed to "maintain[]" or "preserve[]" certain employee compliance records and emails, and deleted or lost a customer testimonial video about the Margin Analyzer that previously appeared on its website. JA320-22 (¶¶167, 169-70). But he does not allege that McKesson was under any obligation to preserve these materials during a time-period that predates this

litigation.  Particularly in light of the "obvious alternative explanation" that McKesson deleted these files in the ordinary course of business, Hart's allegation that McKesson *intentionally deleted* these materials t*o cover up a known anti-kickback violation* rests on nothing more than speculation and "conclusory allegations."

*Second*, Hart "boldly alleges" that McKesson improperly "destroyed" the contents of his work laptop when he belatedly returned it to the company, and hints that the company thereby violated federal law.  SA12; *see* Hart Br. 21-22, 46-47; JA321 (¶168).  Again, Hart offers nothing more than unsupported and baseless speculation that McKesson wiped the contents of his laptop *to hide evidence*, much less that any alleged "concealment" was because McKesson knew its use of two specific tools was unlawful.[19]  Such conclusory allegations are insufficient to create a plausible inference that McKesson engaged in document destruction to hide evidence concerning the Margin Analyzer and Regimen Profiler.  And while Hart attempts to conjure up such an inference from allegations that McKesson wiped the

---

[19] As the District Court observed (while expressly disclaiming any reliance on the fact), the Magistrate Judge overseeing discovery in the case "considered at least some of Hart's accusations that McKesson had destroyed evidence—namely, those related to the destruction of materials on Hart's laptop—and found them to be entirely unsupported."  SA23 n.6 (citation omitted).  Hart's assertion that the Magistrate Judge refused to order discovery because a motion to dismiss was pending, Hart Br. 47 n.14, mischaracterizes the record, which makes clear that the Magistrate Judge found his allegations to be baseless, JA25 (Hr'g Tr. 5:17-21, 8:14-19, 8:24-9:4, 21:22-22:6, 22:15-19 (Jan. 12, 2022) (ECF 144)).

laptop shortly after receiving a Civil Investigative Demand, JA321 (¶168), the SAC is devoid of any particularized allegations of any purported cover-up scheme that would satisfy Rule 9(b).

*Third*, Hart contends that "as of" June 2022 McKesson had "scrub[bed] all references to the Margin Analyzer from its website."[20]  Hart Br. 47; JA320-21 (¶167).  Again, however, Hart offers no well-pleaded allegations that McKesson updated its website because it knew that provision of that tool was unlawful and sought to conceal evidence.  *Iqbal*, 556 U.S. at 678; SA23.  In any event, the allegation that seven years after this action was filed, McKesson's website mentioned the Margin Analyzer only once, JA321 (¶167), says nothing about whether McKesson believed *during the relevant time period* that its conduct was unlawful.  To the contrary, allegations that McKesson publicly advertised these services *undermined* any inference that it believed the services to be unlawful at the time.  SA22; JA245; *Gharibian*, 2021 WL 5406148, at *3; *United States ex rel. Piacentile v. Novartis AG*, No. 04-cv-4265, 2011 WL 13234720, at *9 (E.D.N.Y. Feb. 8, 2011); *supra* pp. 14, 23, 45-46.

---

[20] Hart does not allege that McKesson similarly "scrub[bed]" references to the Regimen Profiler.

## 2. Hart's Alleged Conversations with Other Employees

Hart attempts to create an inference of scienter based on conversations that he allegedly had with other employees while he was employed at McKesson. But Hart cannot allege that he or his interlocutors opined that providing the Margin Analyzer and Regimen Profiler to customers was unlawful, let alone that *McKesson believed its conduct was unlawful*.

*First*, Hart's allegations about these conversations pointedly stop short of alleging that anyone—including even Hart—actually expressed the view that the conduct at issue in this suit was *unlawful*. *See* JA320 (¶165) (alleging that sales employees "discussed that McKesson's use of the [tools] ... was unethical and wrongful" because they supposedly "encouraged physician practices to purchase the highest margin drugs"); *id.* (¶166) (alleging Hart and creator of Margin Analyzer "discussed concerns that McKesson was inappropriately exploiting the value-added business tool that [the creator] had created originally for USON").[21] Hart arguably comes closest in alleging that he told his immediate supervisor that "McKesson's current sales practices ... which included using the Margin Analyzer and the Regimen Profiler, violated the compliance policies that were presented in [a] training session." JA320 (¶ 164). But as the District Court noted, even that allegation

---

[21] Nor does Hart allege that anyone stopped using these tools, as might be expected if they had thought they were breaking the law.

references the at-issue conduct, rather than McKesson's general "sales practices," only through "artful pleading," SA18, and even then fails to allege that Hart told his supervisor that McKesson was acting *unlawfully*. Given that the District Court had already held that Hart needed to plausibly plead that McKesson knew its conduct was unlawful, Hart's failure to make such allegations in the SAC signals his lack of a good-faith basis for doing so.

*Second*, even if Hart or other lower-level employees had expressed the view that McKesson's conduct was unlawful, Hart does not allege that *McKesson* held that belief. A plaintiff may allege that a corporation acted with scienter by alleging that "someone whose intent could be imputed to the corporation acted with the requisite scienter." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (quotation marks omitted). But Hart does not allege that anyone in McKesson's senior management was aware of, let alone shared, these concerns, much less knew the conduct was unlawful. *See United States ex rel. Fitzer v. Allergan, Inc.*, No. 17-cv-668, 2021 WL 4133713, at *7 (D. Md. Sept. 10, 2021) (allegation that relator told corporation that its practice was unlawful insufficient to plead corporate scienter). Accordingly, the SAC provides no basis for inferring that McKesson believed provision of the tools was unlawful.

### 3.   The McKesson Executive Email

In a last-ditch effort to plead scienter, Hart selectively quotes and misleadingly describes an email that stated "You didn't get this from me ... okay?" and attached multiple lengthy USON documents.  JA318-19 (¶160); *see* JA513-686.

Hart's attempts to use this email to allege scienter string together at least two untenable, speculative leaps.  *First*, Hart assumes without basis that this cover note was somehow about the Margin Analyzer and Regimen Profiler.  But the cover note nowhere references the tools.  And, as the District Court explained, the "email attached three separate documents totaling 170 pages, each covering a range of materials" about McKesson's offerings to USON customers.  SA20.  In all these pages, "the Margin Analyzer was only referenced three times, and the Regimen Profiler twice ... and even then, only in passing ...."  *Id.  Second*, Hart reads the cover note as implying that the sender believed the briefly-referenced tools were unlawful, but as the District Court noted, there are "any number of reasons" why one executive may have been circumspect about sending another documents originating from a different business unit.  *Id.*  Reading those allegations in context, and drawing on its "experience and common sense," *Iqbal*, 556 U.S. at 679, the District Court correctly concluded that Hart failed to "raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555.  Hart's argument that the District Court erred by crediting alternative explanations for the email and not drawing inferences in his favor, Hart

Br. 50-51, fails because he never alleged facts sufficient to support a plausible inference in the first place. *See Iqbal*, 556 U.S. at 678.

\* \* \*

At most, Hart alleges that McKesson knew about the AKS, that it engaged in a practice that supposedly violated the AKS, and that several low-level McKesson employees had concerns about the practice. He does not, however, plausibly allege that *McKesson* knew it was acting *unlawfully*. Accordingly, the District Court properly dismissed this action for failure to plead a willful violation of the AKS.

## III. This Court Should Reject Hart's New Theories for Salvaging His State-Law Claims.

In addition to dismissing Hart's FCA claim, the District Court also dismissed Hart's claims under various state analogues (the "state *qui tam* claims") because those claims were premised on alleged violations of the federal AKS. SA16 (citing SAC ¶13 (JA258-59)). McKesson moved to dismiss the SAC in its entirety for failure to plead scienter under the AKS, just as the District Court had previously dismissed Hart's entire FAC on that basis. In response, Hart argued in a single-sentence footnote that even if he failed to plead scienter under the AKS, his state *qui tam* claims should still survive because they were also premised on violations of state anti-kickback laws and because "several" state anti-kickback laws imposed a lower scienter requirement than the federal AKS. Hart Opp'n to Mot. to Dismiss the SAC at 4 & n.1, DC Dkt. 180 (citing only Tex. Hum. Res. Code §§ 36.002(13),

-54-

36.0011(a)). The District Court held, however, that Hart had alleged that claims submitted to state Medicaid agencies were "false" only because those claims allegedly resulted from violations of the AKS, not because they resulted from violations of these state anti-kickback laws. SA16. Although the District Court granted Hart leave to amend to re-plead his state *qui tam* claims based on alleged violations of state anti-kickback laws, SA28, Hart declined to do so.

As a threshold matter, this Court should not consider Hart's belated attempts to revive his state *qui tam* claims based on this new state-law theory. By raising this argument only cursorily in response to McKesson's second motion to dismiss, and even then only with respect to his Texas *qui tam* claim, Hart failed to preserve the argument. *United States v. Hoskins*, 44 F.4th 140, 150 n.2 (2d Cir. 2022).[22] Regardless, Hart has forfeited any argument regarding his state *qui tam* claims (at least other than his Connecticut and Texas claims) by failing to even mention those claims in his opening brief. *See JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 428 (2d Cir. 2005). These omissions are particularly problematic given that state anti-kickback laws frequently parallel the federal AKS, and Hart acknowledges that at least some may have comparably demanding scienter requirements. Hart SAC Opp'n at 4, DC Dkt. 180 ("several" states "do not impose

---

[22] *See also* JA932 (asserting that it was the District Court's obligation to "go through parsing the different state laws and which ones survive").

the 'willfulness' requirement"); *see, e.g.*, Va. Code Ann. § 32.1-315 (requiring willfulness).  Once McKesson moved to dismiss the entire action for failure to plead scienter, Hart needed to adequately explain his alternative theory and identify which state *qui tam* claims (other than his Texas-law claim) should proceed under that theory.

Regardless, the District Court correctly concluded that Hart brought "claims under both the federal FCA and the states' FCAs by way of a violation of the *federal AKS*," and not claims of alleged violations of state anti-kickback laws.  As the District Court noted, Hart alleged that the state laws under which he sued "require[] compliance *with the AKS* as a condition of payment of Medicaid reimbursement." SA16 (discussing SAC ¶13 (JA258-59)).

In response, Hart argues that he did not need to "plead" state law and that his complaint adequately identified various state anti-kickback laws.  Hart Br. 53.  But Hart cannot have stated a claim under state *qui tam* laws—let alone with the particularity required by Rule 9(b), which he concedes applies to those claims— without allegations about why the claims submitted to state authorities were supposedly "false."  Because "falsity" is premised on alleged violations of other laws, he needed to "specify *what* law ... [McKesson] violated and *how* the alleged violation occurred."  *See Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 99 (2d Cir. 2021) ("When a securities fraud claim is premised

-56-

on the defendant's predicate violations of law or accounting standards.... the plaintiff must specify *what* law or standard the defendant violated and *how* the alleged violation occurred."). At most, the SAC alleges that claims submitted to state agencies were false *because* those claims resulted from violations of the *federal* AKS. SA16, 28; JA256-59, 290, 295-96 (¶¶8-10, 13, 96, 114, 116).[23] By contrast, the SAC does not plead with particularity any alleged violations of state anti-kickback laws, but simply notes, in a page-long stringcite, that various states "have" anti-kickback laws. *See* JA265-66 (¶37).[24]

Even assuming that Hart has preserved the issue and plead state kickback violations in his SAC, Hart's Connecticut- and Texas-law claims fail to plead scienter. Hart acknowledges that under either state's *qui tam* law, McKesson could be liable only for *knowingly* causing the submission of a false claim or the making of false records. JA325, 347 (¶¶197-98, 373-74). If the only reason that these claims were allegedly "false" was that they resulted from alleged violations of state anti-kickback laws, then McKesson cannot have knowingly caused the submission of false claims, unless it at minimum acted with reckless disregard for whether its conduct violated these states' anti-kickback laws. *Cf.* Conn. Gen. Stat. § 4-274(1)

---

[23] The District Court has not ruled on the sufficiency under Rule 9(b) of Hart's claims of a nationwide scheme or specific state claims.

[24] Although Hart cites *Wright & Miller*, the cited portion of the treatise nowhere suggests that Rule 9(b) allows a plaintiff to state a claim premised on violations of other laws without actually identifying what laws were supposedly violated or how.

(defining "knowing" to include conscious avoidance or recklessness disregard of truth or falsity); Tex. Hum. Res. Code § 36.011 (same). But the complaint is devoid of any allegations that McKesson was even "conscious of a substantial and unjustifiable risk" that providing the Margin Analyzer and Regimen Profiler to Open Market customers would result in the submission of claims that were "false" because they violated state anti-kickback law. *See United States ex rel. Schutte v. SuperValu, Inc.*, 143 S. Ct. 1391, 1400-01 (2023). Accordingly, for largely the same reasons Hart has not pleaded that McKesson "willfully" violated the AKS, he has also failed to plausibly allege that it "knowingly" caused the submission of false claims to Connecticut or Texas.

## CONCLUSION

The judgment should be affirmed.

Dated: August 1, 2023

S. Conrad Scott
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, NY 10018
Telephone: (212) 841-1249
Facsimile: (646) 441-9249
cscott@cov.com

/s/ Krysten L. Rosen Moller
Krysten L. Rosen Moller
Ethan M. Posner
Nicholas Pastan
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, D.C. 20001
Telephone: (202) 662-5899
Facsimile: (202) 778-5899
krosenmoller@cov.com
eposner@cov.com
npastan@cov.com

*Attorneys for Defendants-Appellees*

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that this document complies with Local Rule 32(a)(4)(A) because this document contains fewer than 14,000 words. This document contains 13,912 words, as calculated using the Word Count feature of Microsoft Word 2016, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f). The undersigned further certifies that this document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14-point font.

August 1, 2023                                    /s/ Krysten L. Rosen Moller
                                                  Krysten L. Rosen Moller

## CERTIFICATE OF SERVICE

I hereby certify that on August 1, 2023, I caused the foregoing Brief of Defendants-Appellees to be filed electronically using the Court's CM/ECF system. I further certify that all participants in the case are registered CM/ECF users, and that service on all parties will be accomplished electronically by the CM/ECF system. I further certify that six paper copies of the Brief will be delivered to the Court by hand delivery.

/s/ Krysten L. Rosen Moller
Krysten L. Rosen Moller