# 23-726

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

ADAM HART,

*Plaintiff-Appellant*,

ABC, UNITED STATES OF AMERICA, ex rel., STATE OF CALIFORNIA, ex rel., STATE OF COLORADO, ex rel., STATE OF CONNECTICUT, ex rel., STATE OF DELAWARE, ex rel., STATE OF FLORIDA, ex rel., STATE OF GEORGIA, ex rel., STATE OF HAWAII, ex rel., STATE OF ILLINOIS, ex rel., STATE OF INDIANA, ex rel., STATE OF IOWA, ex rel., STATE OF LOUISIANA, ex rel., STATE OF MARYLAND, ex rel., STATE OF MASSACHUSETTS, ex rel., STATE OF MICHIGAN, ex rel., STATE OF MINNESOTA, STATE OF MONTANA, STATE OF NEVADA, STATE OF NEW HAMPSHIRE, ex rel., STATE OF NEW JERSEY, ex rel., STATE OF NEW MEXICO, ex rel., STATE OF NORTH CAROLINA, ex rel., STATE OF OKLAHOMA, ex rel., STATE OF RHODE ISLAND, ex rel., STATE OF TENNESSEE, ex rel., STATE OF TEXAS, STATE OF VIRGINIA, ex rel., STATE OF WASHINGTON, ex rel., STATE OF WISCONSIN, ex rel., DISTRICT OF COLUMBIA, ex rel.,

*Plaintiffs*,

*(caption continued on inside cover)*

On Appeal from the United States District Court for the
Southern District of New York, No. 15-cv-903 (Hon. Ronnie Abrams)

## REPLY BRIEF FOR PLAINTIFF-APPELLANT ADAM HART

Andrew C. Shen
KELLOGG, HANSEN, TODD,
 FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
*Counsel for Plaintiff-Appellant*

August 15, 2023

*(additional counsel listed on inside cover)*

*(caption, cont'd)*

v.

MCKESSON CORPORATION, MCKESSON SPECIALTY DISTRIBUTION
LLC, collectively, MCKESSON SPECIALTY CARE DISTRIBUTION
CORPORATION, collectively, dba MCKESSON SPECIALTY HEALTH,
*Defendants-Appellees*,

DEF, MCKESSON SPECIALTY CARE DISTRIBUTION JV LLC, fka
MCKESSON SPECIALTY CARE DISTRIBUTION JOINT VENTURE LP,
*Defendants*.

Stephen S. Hasegawa
PHILLIPS & COHEN LLP
100 The Embarcadero
Suite 300
San Francisco, CA 94105
(415) 836-9000

Ari Yampolsky
CONSTANTINE CANNON LLP
150 California Street
Suite 1600
San Francisco, CA 94111
(415) 639-4001

*Counsel for Plaintiff-Appellant*

James M. Webster
David L. Schwarz
Bradley E. Oppenheimer
Grace W. Knofczynski
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................ 1

ARGUMENT ..................................................................................... 4

I.   THE DISTRICT COURT APPLIED AN ERRONEOUS
     WILLFULNESS STANDARD UNDER THE FEDERAL AKS .................. 4

     A.   The District Court Misconstrued the General Willfulness
          Standard ............................................................................. 4

          1.   McKesson distorts the relevant case law .................................... 5

          2.   McKesson's reliance on the "substantial
               independent value" test is both a *post hoc*
               rationalization and irrelevant ......................................... 9

          3.   McKesson's remaining argument is irrelevant ......................... 14

     B.   Alternatively, the *St. Junius* Standard Should Apply ......................... 14

II.  THE SAC ADEQUATELY ALLEGES WILLFULNESS
     UNDER ANY STANDARD ......................................................... 20

     A.   The SAC Alleges Willfulness ............................................... 20

     B.   McKesson's Attempts To Minimize Specific Allegations
          Fail .................................................................................. 22

III. THE DISTRICT COURT ERRED BY DISMISSING THE
     STATE-LAW CLAIMS ............................................................. 27

CONCLUSION .................................................................................. 30

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

Page

## CASES

*Albert v. Carovano*, 851 F.2d 561 (2d Cir. 1988)......................................28

*Aluminum Warehousing Antitrust Litig.*, *In re*, 95 F. Supp. 3d 419
    (S.D.N.Y. 2015).........................................................................26

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)..................................................22

*Bryan v. United States*, 524 U.S. 184 (1998)..............................15, 16, 17

*Dhaliwal v. Salix Pharms., Ltd.*, 752 F. App'x 99 (2d Cir. 2019)...........9

*Dixon v. United States*, 548 U.S. 1 (2006)...............................................17

*Gamma Traders I LLC v. Merrill Lynch Commodities, Inc.*,
    41 F.4th 71 (2d Cir. 2022) ................................................22, 23

*Gunn v. Cont'l Cas. Co.*, 968 F.3d 802 (7th Cir. 2020) .........................27

*IWA Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141
    (2d Cir. 2021)...........................................................................12

*Klaczak v. Consol. Med. Transp.*, 458 F. Supp. 2d 622
    (N.D. Ill. 2006) ....................................................................9-10

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015) ....................................................24

*Mullenix v. Luna*, 577 U.S. 7 (2015) .....................................................26

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
    709 F.3d 109 (2d Cir. 2013) ....................................................23

*Pfizer, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 42 F.4th 67
    (2d Cir. 2022)...............................................2, 4, 10, 15, 16, 20

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank
    A/S*, 11 F.4th 90 (2d Cir. 2021).............................................28

*United States v. Genesis Glob. Healthcare*, 2021 WL 4268279
(S.D. Ga. Sept. 20, 2021) ................................................................8

*United States v. George*, 386 F.3d 383 (2d Cir. 2004) .....................17, 18

*United States v. Goodwin*, 974 F.3d 872 (8th Cir. 2020) ..........................7

*United States v. Inc. Vill. of Island Park*, 888 F. Supp. 419
(E.D.N.Y. 1995)...............................................................................24

*United States v. King-Vassel*, 728 F.3d 707 (7th Cir. 2013) ...................29

*United States v. Kosinski*, 976 F.3d 135 (2d Cir. 2020) ..........................17

*United States v. Kukushkin*, 61 F.4th 327 (2d Cir. 2023) .......................17

*United States v. Lung Fong Chen*, 393 F.3d 139 (2d Cir. 2004) .............18

*United States v. Moshiri*, 858 F.3d 1077 (7th Cir. 2017) ..........................7

*United States v. Narco Freedom, Inc.*, 95 F. Supp. 3d 747
(S.D.N.Y. 2015).................................................................................9

*United States v. Planned Parenthood Fed'n of Am. Inc.*,
601 F. Supp. 3d 97 (N.D. Tex. 2022) .............................................29

*United States v. Sosa*, 777 F.3d 1279 (11th Cir. 2015) .........................5, 6

*United States v. St. Junius*, 739 F.3d 193 (5th Cir. 2013) ................3, 14, 15, 16, 20

*United States v. Starks*, 157 F.3d 833 (11th Cir. 1998) ..........................19

*United States v. Strock*, 982 F.3d 51 (2d Cir. 2020).................................20

*United States v. Vernon*, 723 F.3d 1234 (11th Cir. 2013) .........................6

*United States v. Waller*, 2017 WL 2559092 (S.D. Tex. June 13, 2017),
*aff'd*, 741 F. App'x 267 (5th Cir. 2018) .........................................15

*United States ex rel. Bias v. Tangipahoa Par. Sch. Bd.*, 816 F.3d 315
(5th Cir. 2016) ................................................................................28

*United States ex rel. Bilotta v. Novartis Pharms. Corp.*,
    50 F. Supp. 3d 497 (S.D.N.Y. 2014) .......................................................... 7-8

*United States ex rel. Bingham v. Baycare Health Sys.*,
    2015 WL 4878456 (M.D. Fla. Aug. 14, 2015)..................................................8

*United States ex rel. Gharibian v. Valley Campus Pharmacy, Inc.*,
    2021 WL 5406148 (C.D. Cal. Oct. 12, 2021) ..............................................21

*United States ex rel. Pasqua v. Kan-Di-Ki LLC*, 2012 WL 12895229
    (C.D. Cal. June 18, 2012) ...........................................................................8

*United States ex rel. Piacentile v. Novartis AG*, 2011 WL 13234720
    (E.D.N.Y. Feb. 8, 2011) ........................................................................ 21-22

*United States ex rel. Schutte v. SuperValu Inc.*, 143 S. Ct. 1391 (2023)..............9, 21

*United States ex rel. Silva v. VICI Mktg., LLC*, 361 F. Supp. 3d 1245
    (M.D. Fla. 2019) ...........................................................................................8

*Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039 (11th Cir. 2015) ...................... 29-30

## STATUTES, REGULATIONS, AND RULES

15 U.S.C. § 78u-4(b)(1) ...........................................................................................29

15 U.S.C. § 78ff(a) ..................................................................................................17

18 U.S.C. § 656 .......................................................................................................18

18 U.S.C. § 924(a)(1)(D) .........................................................................................17

18 U.S.C. § 1542 .....................................................................................................18

42 U.S.C. § 1320a-7a(i)(6) .......................................................................................9

42 U.S.C. § 1320a-7b(b) .......................................................................................1, 8

42 U.S.C. § 1320a-7b(b)(2) .................................................................................9, 18

iv

42 U.S.C. § 1320a-7b(b)(3)(E) ....................................................................10

42 U.S.C. § 1320a-7b(h) ........................................................................3, 18

42 U.S.C. § 1320a-7d(a) ...........................................................................10

52 U.S.C. § 30109 .....................................................................................17

Tex. Hum. Res. Code Ann. § 36.0011(a) ...............................................29

42 C.F.R. § 1008.53 ..................................................................................10

42 C.F.R. § 1008.55(b) .............................................................................10

Fed. R. Civ. P. 9(b) ..........................................................................3, 7, 20

## OTHER MATERIALS

*Black's Law Dictionary* (7th ed. 1999)....................................................16

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case involves a facially obvious, large-scale violation of the federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), and state AKS analogues. The AKS prohibits "knowingly and willfully offer[ing] or pay[ing] any remuneration . . . in cash or in kind" to "induce" the purchase of goods that may be reimbursed by a federal health program. *Id.* McKesson offered two business tools, which it knew were worth $150,000 or more per year, to medical practices for free as an explicit *quid pro quo* for purchasing drugs from McKesson. Those practices then submitted claims to the government and collected payments for many of those drugs, even though federal and state law prohibit the submission and payment of claims tainted by AKS violations. Nothing in the Second Amended Complaint ("SAC") or the law suggests this is anything but willful, unlawful conduct.

McKesson knew that offering the Margin Analyzer and Regimen Profiler to induce purchases of its drugs was illegal. McKesson's training and compliance policies broadly state that offering *anything* of value as an inducement is unlawful. There are no exceptions in the law, or McKesson's policies, for kickbacks in the form of business services, kickbacks that lack "independent or substantial value," or anything else McKesson suggests might inoculate it. Nor do the allegations in the SAC remotely suggest that McKesson believed that goods it valued at $150,000 or more – and which McKesson gave to customers who made purchase

commitments and refused to sell to customers who did not – are not remuneration. McKesson's assertion that Relator has only later alleged, conclusorily, that the Margin Analyzer and Regimen Profiler were prohibited remuneration is a revisionist attempt to justify a straightforward AKS violation, and ignores the well-pleaded factual allegations that must be accepted as true on a motion to dismiss.

The district court incorrectly concluded that the SAC could not adequately allege willfulness based on detailed allegations that (1) McKesson knew it was illegal to offer anything of value to induce drug purchases and (2) nonetheless deliberately offered for free two tools it knew were valued at more than $150,000 as an inducement. Instead, the district court required Relator to allege specifically "that McKesson knew *this particular course of conduct* was unlawful," by alleging, for instance, "actions taken to conceal the fraudulent scheme" or "notice from counsel" that the Margin Analyzer and Regimen Profiler were illegal kickbacks. JA244-245 (emphasis added). That is contrary to this Court's recent observation that willfulness is established when a defendant commits a "voluntary, intentional violation of a known legal duty," *Pfizer, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 42 F.4th 67, 77 (2d Cir. 2022) (citation omitted), and the decisions of multiple other circuit and district courts. McKesson argues otherwise only by ignoring the plain language and facts of those decisions.

Moreover, even McKesson concedes (at 36) that the exact standard Relator advances – "allegations that a defendant paid . . . kickbacks and knew the law prohibits paying kickbacks" – suffices in cases of "straightforward" kickbacks. This *is* a case involving a straightforward kickback, in the form of goods McKesson valued at hundreds of thousands of dollars. Regardless, McKesson can point to no justification for its two-tiered system applying a different standard to "straightforward" kickbacks. The standard McKesson concedes can sometimes suffice *is* the standard, and the SAC satisfies it here.

McKesson's position also contradicts the Fifth Circuit's holding in *United States v. St. Junius*, 739 F.3d 193 (5th Cir. 2013), which appropriately applies the plain language of the AKS. In arguing against the *St. Junius* "willfulness" standard, McKesson relies on different criminal statutes, none of which states (as the AKS does) that a defendant need not have "actual knowledge" or "specific intent" to violate the statute, 42 U.S.C. § 1320a-7b(h).

In any event, under any standard – even the district court's – the SAC plausibly alleges willfulness. The district court erred by misapplying the governing pleading standard under Rule 9(b), which allows state of mind to be alleged "generally." It additionally refused to draw reasonable inferences in Relator's favor, based on well-pleaded allegations, that McKesson knew its conduct was unlawful. McKesson fails to address this legal error, instead offering

3

jury arguments about alternative inferences to draw from incriminating facts, which is improper on a motion to dismiss.

Finally, McKesson's arguments about the state-law claims are flawed. McKesson forfeited these arguments, not Relator. The SAC adequately alleges violations of the state-law AKS analogues.

The judgment below should be reversed.

## ARGUMENT

## I.   THE DISTRICT COURT APPLIED AN ERRONEOUS WILLFULNESS STANDARD UNDER THE FEDERAL AKS

### A.    The District Court Misconstrued the General Willfulness Standard

Courts across the country have held that the AKS's "willfulness" standard is satisfied by evidence that a defendant (1) knows that offering or receiving something of value as an inducement is unlawful, but (2) intentionally offers or receives something the defendant knows is valuable as an inducement anyway. Opening Br. 31-37 (collecting cases). The logical inference from such evidence is that the defendant knows its conduct is unlawful. That is consistent with this Court's recent dicta in *Pfizer*, 42 F.4th at 77 & n.8, that a willful violation requires (1) "a known legal duty" and (2) "a voluntary, intentional violation."

The district court wrongly required more, demanding allegations that McKesson knew the specific course of conduct was unlawful based on additional

4

evidence, such as attempts to conceal the conduct or legal advice.[1]  JA244-245.

That is unnecessary as a matter of logic.  If a defendant knows driving a vehicle in

the park is illegal, knows her car is a vehicle, and still drives her car in the park,

that is sufficient to draw the plausible inference that she knew her conduct was

illegal.  A plaintiff need not allege further that a police officer told the defendant

not to drive her car there to allege willfulness.

### 1.  *McKesson distorts the relevant case law*

McKesson can defend the district court's novel pleading standard for

willfulness only by distorting the relevant case law, which consistently holds that a

defendant who (1) knows what the AKS prohibits, but (2) intentionally does

something that violates it is acting willfully.  McKesson tries (at 34-35) to twist

*United States v. Sosa*, 777 F.3d 1279 (11th Cir. 2015), to mean merely that the

plaintiff "does not need to establish that the defendant knew his conduct *violated*

*the AKS*."  McKesson quotes one sentence from *Sosa*'s discussion of willfulness

defining "willfully" as requiring that the defendant act "voluntarily and purposely,

---

[1] McKesson does not seriously dispute that the types of additional allegations the district court suggested would be essentially impossible for a plaintiff to allege.  *See* Opening Br. 43-44.  It merely argues (at 46-47) that the district court's list of (impossible-to-offer) allegations was not exhaustive. McKesson's refusal to defend the district court's list is telling, and its concession that other types of allegations can suffice shows that the district court's standard was too restrictive.

with the specific intent to do something the law forbids, that is with a bad purpose, either to disobey or disregard the law." McKesson Br. 34 (quoting *Sosa*, 777 F.3d at 1293). But McKesson omits the very next sentence, which states "the defendant need *not* have known that a *specific* referral arrangement violated the law." *Sosa*, 777 F.3d at 1293 (citing *United States v. Vernon*, 723 F.3d 1234, 1256 (11th Cir. 2013)) (emphases added).

McKesson errs in asserting (at 35) that Relator does not explain how "a defendant *could* act" willfully "*without* knowing that his specific conduct was unlawful." The plain language and scope of the AKS is broad. It can be inferred that a defendant who has knowledge of the AKS's broad prohibition and yet still provides anything of value to induce a sale, acts with knowledge that his specific conduct is unlawful. In *Sosa*, evidence that a defendant knew that it was illegal to pay for patient referrals, but deliberately did so, was sufficient to support a jury's criminal conviction beyond a reasonable doubt that the defendant acted "voluntarily and purposely, with the specific intent to do something the law forbids." 777 F.3d at 1293. Here, allegations that McKesson knew that the AKS prohibited giving anything of value to induce purchases, yet designed its nationwide sales strategy to give business tools worth $150,000 to practices as inducements, certainly gives rise to the plausible inference that McKesson knew its

specific conduct was unlawful – particularly under the general pleading standard of Rule 9(b).

McKesson also misconstrues *United States v. Moshiri*, 858 F.3d 1077 (7th Cir. 2017), and *United States v. Goodwin*, 974 F.3d 872 (8th Cir. 2020). In *Moshiri*, the Seventh Circuit upheld an AKS criminal conviction where the only evidence that the defendant knew he was violating the law was that he had (1) signed a Medicare enrollment form "certif[ying] that he would comply with all Medicare rules and regulations, including the [AKS]," but (2) accepted payments for referrals anyway. 858 F.3d at 1082-83. McKesson focuses (at 35) on the defendant's admission that his contract was "basically paying [him] for patients," but that was not relevant to the court's finding that the defendant knew what the AKS prohibited and therefore acted willfully. Similarly, in *Goodwin*, the evidence of the defendant's willfulness was (1) that he had certified that he would comply with the AKS and had "significant experience working with federal health care programs," yet (2) still collected payments for referrals. 974 F.3d at 875-76.

McKesson's conduct here is a straightforward and obvious AKS violation. It is no different from the many cases that Relator has cited.[2] In fact, McKesson's

---

[2] McKesson's attempts (at 36-37) to distinguish Relator's district court cases fare no better. In each case, the court found that alleging knowledge of the AKS's requirements and a deliberate action violating the AKS is sufficient to plead willfulness. In *United States ex rel. Bilotta v. Novartis Pharmaceuticals Corp.*, as here, the defendant's knowledge was based on internal company policies. 50

admission (at 36) that a complaint could satisfy the willfulness standard with "allegations that a defendant paid straightforward kickbacks and knew the law prohibits paying kickbacks," resolves this case. Providing the Margin Analyzer and Regimen Profiler valued at more than $150,000 as a *quid pro quo* for a purchasing commitment is a straightforward kickback violating the AKS, not some conduct that a relator merely "later alleges" was illegal. *Contra* McKesson Br. 3, 33, 36, 43. McKesson's insinuation that this case is different because the kickbacks were not cash bribes is unsupported. The AKS explicitly prohibits providing remuneration – *i.e.*, anything of value, *see infra* pp. 9-10 – whether "in cash or in kind," 42 U.S.C. § 1320a-7b(b). In any event, whether the business tools here were "straightforward kickbacks" such that any defendant must have

---

F. Supp. 3d 497, 519 (S.D.N.Y. 2014). In *United States ex rel. Silva v. VICI Marketing, LLC*, the court relied on the defendant's "research into anti-kickback statutes and his experience in the healthcare industry," not a lawyer's opinion that did not concern the challenged scheme. 361 F. Supp. 3d 1245, 1254 (M.D. Fla. 2019). As for *United States ex rel. Pasqua v. Kan-Di-Ki LLC*, McKesson points to statements that the illegality was well known in the industry, attempting to introduce uncertainty about whether its conduct here violated the AKS when there is none. 2012 WL 12895229, at *5 (C.D. Cal. June 18, 2012). In *United States v. Genesis Global Healthcare*, the allegations were tied to knowledge about the "general parameters of the AKS" and statements that, generally, "investments in healthcare providers were suspect." 2021 WL 4268279, at *12 (S.D. Ga. Sept. 20, 2021). Finally, in *United States ex rel. Bingham v. Baycare Health System*, 2015 WL 4878456 (M.D. Fla. Aug. 14, 2015), the court found knowledge of the AKS based on compliance certifications and deliberate actions sufficient.

known that they violate the law is a jury question that is inappropriate to resolve on a motion to dismiss.

### 2. McKesson's reliance on the "substantial independent value" test is both a post hoc rationalization and irrelevant

McKesson's argument (at 30-33) that knowledge of what the law prohibits combined with deliberately taking that prohibited action cannot establish that willfulness rests on the same type of *post hoc* lawyer-argument the Supreme Court rejected in *United States ex rel. Schutte v. SuperValu Inc.*, 143 S. Ct. 1391, 1399 (2023). McKesson's litigation position (at 7-8, 31-32) is that the AKS does not prohibit providing all things of value as an inducement, only things with "substantial independent value." It then claims that the SAC does not allege that McKesson knew the Margin Analyzer and Regimen Profiler had "substantial independent value." This ignores both the law and well-pleaded facts.

*First*, this supposed test finds no support in the statute. The AKS prohibits "offer[ing] or pay[ing] any remuneration," and defines "remuneration" as the "transfer[] of items or services for free or for other than fair market value." 42 U.S.C. § 1320a-7b(b)(2); *id.* § 1320a-7a(i)(6). Courts applying this expansive definition have concluded that remuneration encompasses "anything of value." *See*, *e.g.*, *Dhaliwal v. Salix Pharms., Ltd.*, 752 F. App'x 99, 100 (2d Cir. 2019) (summary order) ("anything of value in any form whatsoever"); *United States v. Narco Freedom, Inc.*, 95 F. Supp. 3d 747, 756 (S.D.N.Y. 2015) (quoting *Klaczak*

9

*v. Consol. Med. Transp.*, 458 F. Supp. 2d 622, 678 (N.D. Ill. 2006)); *see also Pfizer*, 42 F.4th at 75 (explaining that the "modifier 'any' further broadens the scope of the phrase").

Although McKesson alludes to statutory safe harbors for the AKS (at 7 n.1), there is no "substantial independent value" safe harbor. Rather, that phrase comes from a few advisory opinions by the Office of Inspector General ("OIG") of the Department of Health and Human Services and one sub-regulatory OIG guidance document. Advisory opinions cannot be relied on – or even *cited* – by anyone but the requestor, and McKesson never requested one. 42 C.F.R. §§ 1008.53, 1008.55(b). Similarly, OIG's sub-regulatory guidance document is not binding law, and it cannot and does not create a safe harbor for an AKS violation. 42 U.S.C. § 1320a-7b(b)(3)(E); *id.* § 1320a-7d(a).

*Second*, McKesson's attempt to manufacture uncertainty through its "substantial independent value" argument is divorced from the factual record. The SAC pleads facts establishing that McKesson never believed that such a test applied, and instead understood that the AKS establishes a broad prohibition on providing *anything* of value as an inducement. For example, "McKesson's trainings emphasized that it was a violation of the AKS to provide *anything of value – no matter what the item or service was –* to induce a physician practice to make purchases." JA317 (¶ 157) (emphasis added). All customer-facing

employees – including every Account Executive, the National Vice President of Sales, and Regional Vice Presidents of Sales – underwent these trainings annually. JA317-318 (¶¶ 157-158). McKesson's Employee Code of Conduct reinforces: "[T]here are many laws intended to protect against fraud, waste, and abuse in healthcare. We comply with these laws by not offering *things of value* . . . which may improperly influence the decisions of Healthcare Professionals." JA312 (¶ 144) (emphasis added). Thus, at the time of the AKS violations, McKesson understood that it could not provide anything of value as an inducement. *See infra* p. 21.

*Third*, the district court correctly held that, "even using the 'substantial and independent value' standard urged by Defendants, the complaint still contains sufficient facts to establish that the Margin Analyzer and Regimen Profiler constitute remuneration." JA235. There is no uncertainty here.

The SAC highlights McKesson's repeated acknowledgments of both the tools' qualitative[3] and quantitative[4] value. McKesson tries (at 44) to write these allegations off as "conclusory." They are anything but: each is a factual allegation

---

[3] *E.g.*, JA296, JA299, JA301-308, JA310-311 (¶¶ 117, 122, 129, 131, 132 (describing Margin Analyzer as "one [of], if not our most valuable, tools"), 140, 141).

[4] *E.g.*, JA309 (¶ 135) ($150,000), JA303 (¶ 129(g)) ($240,000), JA310 (¶ 138) ($125,000 for Margin Analyzer alone), JA302 (¶ 129(c)) ($200,000 for Margin Analyzer alone).

quoting a specific statement by McKesson about the value of the Margin Analyzer and Regimen Profiler.

McKesson also tries to dodge its quantitative analyses of the tools' value, by arguing (at 45) that the analysis valuing them at $150,000 was for broader consulting services offered by a different McKesson division. McKesson makes a jury argument and ignores the SAC's specific allegation that Ernest & Young valued the Margin Analyzer alone at $125,000 and the Regimen Profiler at $25,000. JA309 (¶ 135). That is improper on a motion to dismiss, where the Court must "accept[] all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *IWA Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 145 (2d Cir. 2021). Moreover, the inference that McKesson seeks to draw – that tools worth $150,000 to McKesson's USON customers were worthless to its Open Market customers – is implausible on its face. McKesson also ignores the other analyses by its own employees that, *for the Open Market customers* McKesson was soliciting, the tools were worth hundreds of thousands of dollars. *E.g.*, JA302-303 (¶ 129(c), (g)). It also ignores the Open Market division's decision to design its sales strategy around providing the Margin

12

Analyzer and Regimen Profiler as additional "value" rather than competing on the price of its drugs.  *See*, *e.g.*, JA280, JA298 (¶¶ 70, 120).[5]

As to "independent" value, the SAC alleges that McKesson could and did sell drugs without also providing the purchasers with the Margin Analyzer and Regimen Profiler.  JA281-282 (¶¶ 74, 75).  Inversely, as McKesson itself emphasizes (at 45), a different McKesson business division sold access to these two tools without requiring that the customers purchase drugs from McKesson. JA269, JA295-296 (¶¶ 50, 115-116).  Indeed, at least one Open Market customer asked to continue to purchase the Margin Analyzer and Regimen Profiler even though it no longer planned to purchase drugs from McKesson, demonstrating that McKesson's own customers valued the tools independent of any drug purchases. JA282-283, JA296 (¶¶ 76-77, 116).

At bottom, McKesson's reference to a "substantial independent value" test is an *ex post* lawyer's argument.  None of McKesson's internal AKS compliance

---

[5] McKesson's insinuation (at 45) that the tools merely combined McKesson prices and publicly available reimbursement information is irrelevant and false. Even if the tools solely used publicly available information, they were valuable because medical practices would otherwise have to pay employees or consultants to gather and analyze this data.  JA270, JA294-295, JA311 (¶¶ 52, 112, 142).  But the tools also included non-public information about each individual practice's reimbursement rates from private insurers.  JA277 (¶ 63).  McKesson also repeatedly touted them as offering "unique" services that "no one else can give." JA305 (¶ 129(p)); *see also*, *e.g.*, JA280 (¶ 70).

policies or trainings reference such a test, nor is there any allegation that McKesson ever considered such a test in evaluating the Margin Analyzer and Regimen Profiler. Allowing a defendant to rely upon *ex post* lawyer's arguments to defeat allegations of "willfulness" would effectively insulate all defendants from AKS liability. Any defendant could introduce speculative legal argument as to why something is not remuneration and, even if rejected by the court (as was the case here), then claim that this speculation is grounds to dismiss on "willfulness."

### 3. *McKesson's remaining argument is irrelevant*

McKesson also claims (at 32) that the prevailing test for willfulness is overly broad because giving remuneration violates the AKS only when done to induce drug purchases. This objection is irrelevant given Relator's specific inducement allegations. *See*, *e.g.*, JA283 (¶ 77) ("McKesson explained that Summit could keep its access to the Margin Analyzer only if it continued to purchase drugs through McKesson."), JA296 (¶ 116), JA298-301 (¶¶ 121-127); *see also* JA318 (¶ 159). McKesson has not challenged (and cannot challenge) the sufficiency of those allegations.

### B. Alternatively, the *St. Junius* Standard Should Apply

The SAC also satisfies the willfulness standard adopted in *United States v. St. Junius*, 739 F.3d 193 (5th Cir. 2013). There, the Fifth Circuit held that "willfully" in the AKS requires the plaintiff to "prove that the defendant willfully

committed an act that violated the Anti-Kickback Statute" and not to "prove that she knew that [her conduct] was illegal." *Id.* at 210-11. If the Court reaches this issue, it should adopt the *St. Junius* standard – which, contrary to McKesson's suggestion (at 39), remains good law in the Fifth Circuit. *See*, *e.g.*, *United States v. Waller*, 2017 WL 2559092, at *5 (S.D. Tex. June 13, 2017), *aff'd*, 741 F. App'x 267 (5th Cir. 2018) (per curiam) (discussing and applying *St. Junius*). The cases McKesson cites do not hold otherwise.

The *St. Junius* standard is not irreconcilable with this Court's decision in *Pfizer*, which did not examine the minimum allegations necessary to allege willfulness. *Contra* McKesson Br. 38. As Relator acknowledged in his opening brief (at 31), this Court opined in a footnote in *Pfizer* that "a person can 'willfully' violate a statute as long as he knows that his conduct is illegal, even if he is not aware of the exact statutory provision that his conduct violates." 42 F.4th at 77 n.8 (citing *Bryan v. United States*, 524 U.S. 184, 190 (1998)). That is dicta. The holding in *Pfizer* was that the term "willfully" under the AKS does not require a "corrupt intent." *Id.* at 77. The Court did not need to decide the minimum allegations necessary to allege willfulness, and it did not consider the *St. Junius* standard. The Court's statement that a defendant acts willfully if "he knows that his conduct is illegal," *id.* at 77 n.8, is thus "judicial comment . . . unnecessary to

the decision." *Contra* McKesson Br. 38 (quoting *Black's Law Dictionary* 1100 (7th ed. 1999)).

The cases underlying the *Pfizer* footnote and McKesson's argument come from criminal statutes outside the AKS.  Even there, willfulness does not always require knowledge that conduct is unlawful.  *Bryan*, McKesson's lead case, explains that willfulness "[m]ost obviously . . . differentiates between deliberate and unwitting conduct."[6]  524 U.S. at 191.  *Bryan* also qualified its statements about "willfully" by noting that it "typically" or "[a]s a general matter" requires knowledge that conduct is unlawful – not, as McKesson suggests (at 25-26), that it *always* requires that.  524 U.S. at 191.  Contrary to McKesson's assertion (at 25), *Bryan* nowhere describes "knowledge that his conduct was unlawful" as the "minimum" willfulness standard in a criminal statute.

McKesson effectively ignores the decisions of this Court and the Supreme Court identifying another option for willfulness, even in the criminal context. These cases, which Relator cited (at 39), interpret willfulness to require deliberate action but not knowledge that the action is unlawful.  McKesson attempts (at 40 n.15) to discredit these decisions as predating the Supreme Court's subsequent

---

[6] *Bryan* also forecloses McKesson's argument (at 41) that the *St. Junius* standard reads "knowing" out of the statute.  "'[K]nowingly' merely requires proof of knowledge of the facts that constitute the offense."  *Bryan*, 524 U.S. at 193. Willfully also requires "deliberate . . . conduct."  *Id.* at 191.

clarification of the meaning of willfully. That is incorrect. In *United States v. George*, 386 F.3d 383, 389 (2d Cir. 2004), then-Judge Sotomayor extensively analyzed the same Supreme Court decisions about "willfulness" that McKesson invokes (at 24-26).[7] She concluded that "[t]he significance of *Cheek*, *Ratzlaf*, and *Bryan*, in turn, lies in their atypicality," because "only in exceptional cases has the Supreme Court interpreted the term 'willfully' in criminal statutory *mens rea* provisions to require proof of the defendant's specific purpose to violate the law." 386 F.3d at 390, 392.

The AKS is not one of those exceptional cases requiring proof of specific intent to violate the law. It differs from the criminal statutes in the cases McKesson cites (at 24-26) in important ways. *First*, unlike the AKS, those criminal statutes prohibit "willfully violat[ing]" particular "provision[s]" of a statute. 18 U.S.C. § 924(a)(1)(D) (firearm licensing statute in *Bryan* and *Dixon*); 15 U.S.C. § 78ff(a) (Securities Exchange Act in *United States v. Kosinski*, 976 F.3d 135, 152 (2d Cir. 2020)); and 52 U.S.C. § 30109 (Federal Election Campaign Act in *United States v. Kukushkin*, 61 F.4th 327, 331 (2d Cir. 2023)). The AKS, by

---

[7] McKesson cites one Supreme Court holding about willfulness in the criminal context that postdates the Second Circuit's decision in *George*: *Dixon v. United States*, 548 U.S. 1 (2006). But the portion of *Dixon* that McKesson quotes (at 25) is in turn merely quoting the *Bryan* holdings that this Court examined in *George*. 548 U.S. at 5.

contrast, focuses on conduct: "willfully offer[ing] or pay[ing] any remuneration." 42 U.S.C. § 1320a-7b(b)(2). Willfully violating a particular statutory provision may require knowledge that one's actions are unlawful, but "willfully offer[ing] or pay[ing] any remuneration . . . to induce" a purchase focuses on the defendant's awareness of the actions themselves, not their unlawfulness.

The statutes underlying Relator's cases all proscribe deliberate conduct, just like the AKS. *See* Opening Br. 39. In *George*, the statute prohibited "willfully and knowingly mak[ing] any false statement in an application for passport," 18 U.S.C. § 1542. This Court interpreted it to require proof the defendant was deliberately making a false statement and not proof of "a specific purpose . . . to violate the law, either generally or § 1542 specifically." 386 F.3d at 389. Similarly, in *United States v. Lung Fong Chen*, this Court held that a jury instruction requiring a finding that defendants knew their conduct was unlawful was unnecessary when the statute, 18 U.S.C. § 656, criminalized "willfully misappl[ying]" bank funds. 393 F.3d 139, 145 (2d Cir. 2004).

*Second*, unlike the criminal statutes underlying McKesson's cases, the AKS expressly states that knowledge of the statute is not required. *See* 42 U.S.C. § 1320a-7b(h). When Congress added this provision in 2010, it also made clear that the AKS's willfulness standard does not require knowledge of illegality. The AKS is not a "highly technical statute[ ]" – like the tax code – that requires

18

knowledge of a statutory provision to avoid ensnaring otherwise innocent conduct. *See*, *e.g.*, *United States v. Starks*, 157 F.3d 833, 838 (11th Cir. 1998). In fact, the AKS is the only statute that prohibits giving something of value to induce a sale in this context. Individuals give things of value to induce sales all the time: lawyers take clients out to dinners; software salespeople invite business people to junkets; retailers offer customers free goods if they purchase something; and real estate agents pay for referrals. It makes little sense to require proof the defendant knew the conduct was illegal (which was solely because of the AKS), but not proof the defendant knew the conduct violated the AKS.

McKesson illustrates this absurdity when it lists other laws a defendant could also break while violating the AKS – such as laws related to wire fraud – and admits that "the AKS reaches a defendant who pays a kickback knowing that his conduct violates *some* law, regardless of whether he knows that the AKS prohibits it." McKesson Br. 42 (emphasis added). Under McKesson's approach, a defendant who did not know it was illegal to pay kickbacks would still be liable for "willful" violation of the AKS if he offered kickbacks in connection with a scheme that he knew constituted federal wire fraud. But a defendant who undertook the same acts but without using the interstate wires would not be liable under the AKS. Whether a defendant violated the AKS cannot turn on whether the defendant also knew he violated another law.

19

## II.    THE SAC ADEQUATELY ALLEGES WILLFULNESS UNDER ANY STANDARD

### A.    The SAC Alleges Willfulness

McKesson agrees (at 20) that, under Rule 9(b), "the plaintiff can plead knowledge generally."  The SAC contains more than enough plausible allegations to give rise to a "strong inference" of knowledge under the general pleading requirements of Rule 9(b).  McKesson Br. 20 (citing *United States v. Strock*, 982 F.3d 51, 66 (2d Cir. 2020)).  McKesson fails to grapple seriously with many of the SAC's factual allegations.

The SAC alleges, and it cannot be disputed at this stage, that McKesson knew it was unlawful under the AKS to provide "*anything*" of value for free to induce purchases, knew that the Margin Analyzer and Regimen Profiler were extraordinarily valuable (independent of McKesson's drugs), and deliberately offered them for free to induce purchases.  *See supra* pp. 10-11.  The SAC even alleges that McKesson employees knew that offering *these specific tools* for free was illegal.  *See generally* Opening Br. 47-50.  These allegations more than satisfy both the standard previously suggested by this Court in *Pfizer* and the *St. Junius* standard.  They also suffice under the erroneous willfulness standard the district court applied, and McKesson defends.  *See* SA15-16.

McKesson additionally contends (at 43-45) that, to establish willfulness, the SAC must allege not only that the Margin Analyzer and Regimen Profiler had

value, but that they "had the *type of independent value* that the government and courts have found qualify as 'remuneration.'"  This attempt to invoke the "substantial independent value" test from some advisory opinions fails as explained above: they have no legal force.  Moreover, the SAC makes clear that McKesson did not believe that such a test applied; its lawyers argue this standard after the fact.  *See supra* pp. 9-13; *cf. SuperValu*, 143 S. Ct. at 1399 ("The FCA's scienter element refers to respondents' knowledge and subjective beliefs – not to what an objectively reasonable person may have known or believed.").

McKesson also repeats the district court's error in arguing (at 45-46) that its open advertising of the Margin Analyzer and Regimen Profiler undermines allegations of willfulness.  McKesson has no answer to the case law providing that no concealment is required, *see* Opening Br. 42-43.  Indeed, it concedes (at 46 n.17) that "an 'overt' kickback can be made willfully."  It is impermissible to infer in McKesson's favor that its kickbacks were not willful just because certain aspects of McKesson's conduct were "overt," particularly when the AKS expressly prohibits such "overt" kickbacks.  Opening Br. 42-43.[8]

_____

[8] McKesson cites (at 50) two inapposite district court cases to suggest that overtly offering kickbacks conflicts with willfulness.  Unlike here, the plaintiffs in those cases had not alleged *any* facts, "even generally," that might support a finding of willfulness. *United States ex rel. Gharibian v. Valley Campus Pharmacy, Inc.*, 2021 WL 5406148, at *3 (C.D. Cal. Oct. 12, 2021); *see also United States ex rel. Piacentile v. Novartis AG*, 2011 WL 13234720, at *9

### B.    McKesson's Attempts To Minimize Specific Allegations Fail

McKesson tries (at 47-48) to defend the district court's refusal to credit

certain of Relator's willfulness allegations by dismissing them as "conclusory."

Not so.  The Supreme Court has explained: "for the purposes of a motion to

dismiss [courts] must take all of the factual allegations in the complaint as true,"

but that rule "is inapplicable to *legal* conclusions" and to "[t]hreadbare recitals of

the elements of a cause of action, supported by mere conclusory statements" that

those elements are satisfied.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis

added).  Allegations like the ones here – for example, that McKesson destroyed

potentially incriminating documents after receiving a Civil Investigative Demand

from the Department of Justice, and that one of its executives instructed Relator to

ignore AKS compliance training in connection with sales efforts centered around

the Margin Analyzer and Regimen Profiler – are not legal conclusions or

threadbare recitals of elements of the AKS.  They are allegations of fact the district

court must credit on a motion to dismiss.

The sole case McKesson cites for this point, *Gamma Traders I LLC v.

Merrill Lynch Commodities, Inc*., 41 F.4th 71 (2d Cir. 2022), is inapposite.  That

case involved the "disfavored" practice of probabilistic pleading, in which a

---

(E.D.N.Y. Feb. 8, 2011) ("Plaintiffs fail to even suggest that Novartis [acted] 'with
the intent to do something that the law forbids.'").

plaintiff alleges "that out of one million trades, there might be at least one in which [it] came out on the losing end," "though it has no idea which one or when it may have occurred." *Id.* at 78. This case involves specific statements and conduct attributed to specific McKesson executives, which the district court erred by disregarding or rewriting. *See* Opening Br. 45-52.

McKesson also makes token attempts to address certain specific allegations. These are jury arguments that cannot be credited on a motion to dismiss.

**Document destruction.** As McKesson concedes (at 49-50), the SAC alleges that "McKesson wiped [Relator's] laptop shortly after receiving a Civil Investigative Demand" – *i.e.*, after it had a legal duty to preserve that evidence. JA321 (¶ 168). McKesson's only response is to suggest that it might have violated that legal duty for some unidentified reason other than to conceal incriminating evidence. But "the existence of other, competing inferences does not prevent the plaintiff's desired inference from qualifying as reasonable unless at least one of those competing inferences rises to the level of an 'obvious alternative explanation.'" *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 121 (2d Cir. 2013). Here, a desire to conceal incriminating evidence is a reasonable inference to draw from this conduct, and it suggests that McKesson knew its sales practices violated the AKS. Its destruction of other highly relevant

23

documents about the value of these tools (such as a customer testimonial video and advertising webpages) supports the same inference.

**Reporting of violations.** In an effort to minimize conversations in which employees discussed McKesson's AKS violations, McKesson repeats (at 51-52) the district court's error of artificially distinguishing between violations of McKesson's "compliance policies" and the AKS. It has no answer to the fact that the compliance policies *were* AKS compliance policies and that Relator reported McKesson's violation to his supervisor during training on these AKS policies. *See* Opening Br. 48-50. Instead, McKesson tries to argue (at 52) that none of the employees in these conversations were sufficiently "senior" to have their knowledge "imputed to the corporation." There is no "seniority" requirement,[9] but even if there were, the SAC alleges involvement by senior executives: Bennett Holtzman, a Regional Vice President who later became McKesson's National Vice President of Sales and Account Management; Brian Larson, McKesson's Director

---

[9] "Respondeat superior applies to violations of the False Claims Act committed by an employee of a corporation who is acting within the scope of his authority and, at least in part, for the employer's benefit." *United States v. Inc. Vill. of Island Park*, 888 F. Supp. 419, 438 (E.D.N.Y. 1995) (collecting cases). The case McKesson cites, *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*, 797 F.3d 160, 177 (2d Cir. 2015), says nothing about seniority and instead makes clear that a complaint can allege corporate scienter by pointing to *anyone* "whose intent could be imputed to the corporation."

of Clinical Services; and multiple Account Executives. *All* those individuals (and many others) knew about McKesson's misconduct.

**Executive's knowledge.** Relator also identified an email to Kirk Kaminsky attaching a document containing a valuation of each tool, thus showing that he knew the Margin Analyzer and Regimen Profiler together were valued at $150,000 per year. Kaminsky was McKesson's Senior Vice President of Open Market Sales and the man McKesson's President personally assigned "to evaluate [McKesson's] overall strategy" concerning the "Margin Analyzer," JA727. When the Senior Vice President of Sales, who is responsible for the overall strategy, knows (1) that the AKS prohibits giving away valuable things for free to induce purchases, (2) that the two tools are extremely valuable, and (3) that his sales organization is deliberately giving the tools away for free, the only plausible inference is that he (and McKesson) is acting willfully under any standard. *See supra* pp. 5-8.

McKesson ignores what Kaminsky's receipt of the attachment demonstrates about his knowledge, focusing exclusively on the cover email ("You didn't get this from me . . . okay?") instead. To be sure, the cover email evidences consciousness of guilt, but McKesson misses the importance of the attachment. Regardless, McKesson's argument (at 53-54) that the cover email is susceptible to multiple interpretations is a jury argument and ignores the case law that, on a motion to dismiss, if "an email[] is susceptible to two or more competing inferences," the

court must draw the one in the plaintiff's favor. Opening Br. 51 (quoting *In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419, 436 (S.D.N.Y. 2015)).

Collectively, these factual allegations more than give rise to a "strong inference" of willfulness. *See supra* p. 20. If allegations like these are not enough to demonstrate willfulness, then virtually no relator will be able to plead an AKS violation. Indeed, that is essentially McKesson's request here: it suggests (at 44) that the only way to prove willfulness is to prove that "the *specific conduct* has been *clearly recognized* as unlawful by internal policies, legal advice, industry guidance, or case law." (Emphases added.)[10] That is effectively a qualified-immunity standard that would shield AKS violators absent overwhelmingly clear guidance. *Cf. Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (discussing qualified-immunity standard). There is, of course, nothing in the AKS's text, structure, or purpose that would justify this gaping immunity, and the district court erred in creating it.

---

[10] The SAC alleges that McKesson had internal policies prohibiting giving away anything of value as an inducement based on the AKS. *See supra* pp. 10-11. What McKesson appears to be looking for is an internal policy stating that giving away the Margin Analyzer and Regimen Profiler violated the AKS. That cannot be the standard for pleading willfulness.

## III. THE DISTRICT COURT ERRED BY DISMISSING THE STATE-LAW CLAIMS

McKesson offered no argument in its motion to dismiss that would have sufficed to dismiss all of Relator's state-law claims. That is because McKesson's sole argument was that the SAC did not allege willfulness, and not all of the relevant state laws require willfulness. Relator pointed that out in the district court and in his opening brief on appeal. *See* Opening Br. 52-53; JA876. McKesson now argues (at 54-58) that Relator somehow failed to preserve the state-law claims that McKesson never gave any reason to dismiss. This argument turns the law of preservation on its head.

McKesson bases its argument on the premise (at 56) that once McKesson said it was moving to dismiss the entire complaint (no matter what arguments it made), Relator bore the burden of presenting "alternative" theories to save the state-law claims. That is wrong as a matter of law. "It is the defendant's burden to establish the complaint's insufficiency." *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 806 (7th Cir. 2020). McKesson offered no argument sufficient to dismiss all of the state-law claims, and therefore could not carry this burden as to the state-law claims. Moreover, even if Relator had some sort of burden to point out this deficiency, Relator did so in his opposition brief.[11]

---

[11] McKesson says (at 5, 54) that Relator's argument was exclusively in a footnote. Not so. The body text of Relator's brief made clear that "[McKesson]

27

McKesson tries (at 56-57) to sidestep the effects of its waiver by adopting the district court's view that the SAC's state-law claims depend exclusively on *federal* and not state AKS violations.  The SAC, on its face, disproves that contention.  *See* JA265-266 (¶ 37) ("[C]ompliance with both federal *and State* anti-kickback statutes and rules [is] a prerequisite to a physician's right to receive or retain reimbursement payments[.]") (emphasis added).

All of that is unnecessary in any event, because complaints need not plead legal theories.  *See*, *e.g.*, Opening Br. 53; *Albert v. Carovano*, 851 F.2d 561, 571 n.3 (2d Cir. 1988) (en banc) ("The failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim.  Factual allegations alone are what matters."); *United States ex rel. Bias v. Tangipahoa Par. Sch. Bd.*, 816 F.3d 315, 321 (5th Cir. 2016) ("Dismissal is improper if the allegations support relief on any possible theory.") (citation omitted).  McKesson resists this legal principle (at 56-57) by citing a securities law case, *Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 99 (2d Cir. 2021).  But the pleading requirement in that case derived from the Private Securities Litigation Reform Act ("PSLRA"), which imposes a heightened requirement to plead why an

---

has not moved to dismiss any of Relator's state law claims, several of which do not impose the 'willfulness' requirement, which exists under federal law."  JA876.

accounting statement is misleading.  *See* 15 U.S.C. § 78u-4(b)(1).  This is not a PSLRA case.

Finally, McKesson newly argues (at 57-58) that even though state AKS analogues may not require willfulness, the underlying state FCA analogues still require "knowing" conduct.  This argument appeared nowhere in McKesson's district court briefing, even after Relator pointed out that McKesson's argument would not apply to all the state-law claims, so this Court need not consider it.[12]  But it does not help McKesson anyway.  It is true that certain states whose AKS statutes do not require "willfulness," like Texas, may still require "knowing" conduct under the states' FCA laws.[13]  But "knowing" is far from "willfulness," especially in the FCA context.

To satisfy the "knowing" requirement, "[plaintiff] need only show that [defendant] had reason to know of facts that would lead a reasonable person to realize that she was causing the submission of a false claim . . . or that [defendant] failed to make a reasonable and prudent inquiry into that possibility."  *United States v. King-Vassel*, 728 F.3d 707, 713 (7th Cir. 2013); *Urquilla-Diaz v. Kaplan*

---

[12] In its reply brief, McKesson did not cite even a single state FCA analogue. It made its entire responsive argument in a footnote.  JA903 n.1.

[13] The definition of "knowingly" in the Texas FCA, Tex. Hum. Res. Code Ann. § 36.0011(a), is "substantially similar" to the federal definition.  *United States v. Planned Parenthood Fed'n of Am. Inc.*, 601 F. Supp. 3d 97, 108 (N.D. Tex. 2022).

*Univ.*, 780 F.3d 1039, 1058 (11th Cir. 2015) (same; collecting cases from additional circuits). The SAC more than adequately alleges facts to show that McKesson was at least reckless as to whether it was complying with the AKS. That is all the FCA and state analogues (like Texas's) require.

## CONCLUSION

The judgment below should be reversed.

Respectfully submitted,

/s/ *Andrew C. Shen*

Stephen S. Hasegawa
PHILLIPS & COHEN LLP
100 The Embarcadero
Suite 300
San Francisco, CA 94105
(415) 836-9000
shasegawa@phillipsandcohen.com

Ari Yampolsky
CONSTANTINE CANNON LLP
150 California Street
Suite 1600
San Francisco, CA 94111
(415) 639-4001
ayampolsky@constantinecannon.com

*Counsel for Plaintiff-Appellant*

August 15, 2023

Andrew C. Shen
James M. Webster
David L. Schwarz
Bradley E. Oppenheimer
Grace W. Knofczynski
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
ashen@kellogghansen.com
jwebster@kellogghansen.com
dschwarz@kellogghansen.com
boppenheimer@kellogghansen.com
gknofczynski@kellogghansen.com

*Counsel for Plaintiff-Appellant*

30

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rule of Appellate Procedure 32(g), that this reply brief complies with the type-volume limitation of Local Rule 32.1(a)(4) because, excluding the portions of the brief exempted by Federal Rule of Appellate Procedure 32(f), the brief contains 6,989 words.

I further certify that this reply brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) and Local Rule 32.1 because it has been prepared using Microsoft Word 2016 in a proportionally spaced typeface (Times New Roman, 14 point).

/s/ *Andrew C. Shen*
Andrew C. Shen

*Counsel for Plaintiff-Appellant*

August 15, 2023